## district court of the United States
### district for Eugene

Galice Mining District )

[1525] Plat I, Sutherlin, oregon [97479] )

:ida-lee: [reman]
Recorder for the Galice Mining District )
Ph # 971-221-9066 )

:kerby- dale: [jackson] )
Chief Executive Officer )
for the Galice Mining District )

:delant – cory: [palmerton] )
Vice Executive Officer )
for the Galice Mining District )

:irvin - lee: [adkins] )

Private Attorney General )

    Petitioners /Administrators/ Plaintiffs )
            Vs )
  )
  )
  )

STATE OF OREGON )

Civil Action No. 6:13- CV-00 682 -TC
Date: April 23, 2013

**Complaint and Application for
Injunctive Relief**

Administrative Law Judge

Judge Ann Aiken

Governor John Kitzhaber *et.al.*
   160 State Capitol
   Salem, Oregon 97301-4047

Senator Peter Courtney et. *al.*
   900 Court St. NE S-201
   Salem, Oregon 97301

Senator Jackie Dingfelder *et. al*
   900 Court St. NE S-407
   Salem, Oregon 97301

Senator Alan Bates *et. al.*
   900 Court St. NE S-407
   Salem, Oregon 97301
         Respondents/ Defendants

FILED 23 APR '13 10:10 USDC-ORE

# TABLE OF CONTENTS

I.      TABLE FOR AUTHORITIES ................................................................................................

II.     INTRODUCTION ...........................................................................................................

        A. Parties

        B. Jurisdiction

        C. Action Sought

III.    FACTUAL BACKGROUND .............................................................................................

IV.     ARGUMENT ..................................................................................................................

        A. Galice Mining District is Entitled to A Restraining Order and an Emergency
           Preliminary Injunction requiring the State of Oregon to vet the lawfulness of the
           proposed legislation.

        B. Galice Mining District is likely to prevail on its merits

        C. Hundreds of miners and other property owners will face Irreparable
           Damage Absent Injunction. ...........................................................................

        D. There is little possibility of harm to Respondents if Relief is Granted and the Balance
           of Harm Weighs in Favor of the Petitioner ...................................................................

        E. There is a strong Public Interest in Granting Petitioner's Motion

        F. Mining Claims Are Property Protected by the 5th Amendment

        G. The Right to Mine

        H. State and Other Local Gov. May Not Prohibit Mining nor Create
           Unreasonable Regulations regarding Mining.

V.      CONCLUSION ....................................................................................................

VI.     CERTIFICATE OF SERVICE...............................................................................

VII.    EXHIBITS ......................................................................................................

# I. TABLE FOR AUTHORITIES

Ivanhoe Mining Co. vs. Consolidated Mining Co. (102 US 167)

Belk vs. Meagher (1878) 3 Mont. 65, 78

Robertson vs. Smith, 1 Mont. 410 US v. Shumway

(No. 96-16480) Swanson v. Babbit

Fletcher vs. Peck, 10 US 87

Freese v. United States, 639 F.2d 754

Gold Hill Quartz Mining Co. vs. Ish, 5 Oreg. 104

SOUTH DAKOTA MINING ASSOCIATION, INC. v. LAWRENCE COUNTY

Ventura County v. Gulf Oil Corp.

Kleppe v. New Mexico, 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34, 45 Brubaker v. Board of

County Com'rs, El Paso County, Colo.

Sharkey v. Candiani, 48 Oreg. 112

PPL Montana v. Montana (132 S.Ct. 1215

Wilbur Hardy et al. v. Oregon State Land Board

U.S. v. Estate of E. Wayne Hage and Wayne N. Hage

## II. INTRODUCTION

A. The Parties are:

1. The Respondents are the State of Oregon and several of its agents, including John Kitzhaber, Governor of the State of Oregon and State Senator Alan Bates, State Senator Jackie Dingfelder and State Senator Peter Courtney. Alan Bates is the sponsor and author of several pieces of the legislative activity in question and is Vice President of the Oregon State Senate Committee for Environment and Natural Resources which is responsible for the vetting of his legislation. Jackie Dingfelder is the President of the Oregon State Senate Committee for Environment and Natural Resources which is responsible for the vetting of the legislation. Peter Courtney is the President of the Oregon State Senate and is responsible for oversight of the Oregon State Senate Committee for Environment and Natural Resources.

2. The Petitioners are Galice Mining District (organized) and its elected officers: :ida-lee: [reman], Recorder for the Galice Mining District; :kerby- dale: [jackson], Chief Executive Officer for the Galice Mining District; :delant – cory: [palmerton], Vice Executive Officer for the Galice Mining District and :irvin - lee: [adkins], miner and Private Attorney General.

   a. As miners and elected officials within the Galice Mining District, which is duly recognized as having local mining rules, regulations and customs in force inside the lines of its boundaries, the Petitioners have not only legal standing, but a responsibility to "protect and preserve" the rights, liberty, property and livelihoods of duly recognized member-miners within the lines of the mining district and to stand as "*guards for their mining rights, their properties and the yields thereof and therefore.*" inasmuch as The Petitioners pledged "*to diligently execute their offices within the parameters of the Constitution for the United States of America, the Mining Law and the Common Law*" and pledged "*their support of the Constitution, the Mining Law, the Galice Mining District and the decisions thereof.*"

   b. Under the local laws of the miners in this district, it was "*Resolved 4th: "An attack on the rights of any miner in the Galice Mining District, shall be considered to be an attack on the rights of every miner in the district. The Galice Mining District, its officials and*

*every miner in the district have a moral obligation to defend the rights of his/her fellow
miner and come to his/her aid. Any miner in the district may request that the Galice
Mining District, its officials and the miners within this mining district come to his/her
aid.*"

c. The district regulations further add in part, that "*Resolved 6th: All matters pertaining
to valuable mineral deposits (as described in the Acts of 1866, 1870 and 1872), that
occur within the lines of the boundaries of the Galice Mining District, are the
jurisdiction of said mining district.*"

d. Galice Mining District was first established in 1853 near the mouth of Galice Creek,
which is now located in Josephine County, Oregon. After the passage of the Act to
Promote the Development of the Mining Resources of the United States of 1872, the
Galice Mining District was subsequently re-organized on November 28th, 1874. A
record of its re-organization and local mining legislative activities of that period are
stored in the vault of the County Clerk of Josephine County, Oregon. Said record is
identified as "Recorders Book for Mining District-Galice Creek, 1874-1882" by the
Oregon State Archives which is managed by the Oregon Secretary of State. The purpose
of the Galice Mining District is to "Protect and Preserve" the rights of locatable mineral
miners inside the lines of the Galice Mining District, "to achieve the goals of the
miners, to wit: to provide guards for their mining rights, their properties and the yields
thereof and therefore." Under the authority of Congress via the "Act To Promote The
Development of the Mining Resources of the United States of 1872", the miners within
the Galice Mining District have a local legislative authority to create local mining
"*regulations not in conflict with the laws of the United States.*" (30 USC 28). This
legislative authority was also recognized by the State of Oregon, which affirmed that
"*Miners shall be empowered to make local laws in relation to the possession of water
rights, the possession and working of claims, and the survey and sale of town lots in
mining camps, subject to the laws of the United States.*" (Section 3832, "Codes and
General Laws of Oregon", 1892). Galice Mining District is one of several mining
districts located in South Western Oregon and constitutes the recognized local authority
of many locatable mineral miners within Josephine, Jackson and Douglas counties.

Beginning in December of 2012, Galice Mining District and its officers have tried to gain remedy from the State of Oregon by way of notices, public records requests and other means. To date, these activities have gone largely ignored by the respondents and their staff members.

B. Jurisdiction:

1. Pursuant to *TITLE 28 > PART IV > CHAPTER 85 > § 1331, Federal question* **"The district courts** *shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."* Petitioners hereby bring this **Complaint and Application for Injunctive Relief** before the **"district court of the united states"** inasmuch as the matters on hand concern Federal questions.

2. Pursuant to *TITLE 28 > PART IV > CHAPTER 85 > § 1340 Internal revenue; Customs Duties,* **"The district courts** *shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Court of International Trade"* Petitioners hereby bring this **Complaint and Application for Injunctive Relief** before the **"district court of the united states"** inasmuch as the matters on hand concern Acts of Congress having to do with mining of locatable minerals which is internal revenue.

C. The Action Sought:

In defense of their Congressionally Granted and Federally Protected Rights, their property and livelihoods and in defense of the Act To Promote The Development of the Mining Resources of the United States of 1872 and the Laws of the United States, the Petitioners are seeking an emergency preliminary injunction against the passage of Oregon Bills SB 115, SB 370, SB 401 and SB 838 and issue a petition for redress of grievances, seeking the assistance of the United States and its agencies to address the legislation proposed by the respondents, which the Petitioners charge is in violation of Federal, State and Local Laws. If not granted, the Petitioners and the locatable mineral miners which they were elected to represent, will suffer irreparable harm to their rights, property, livelihoods and liberties, resulting in a high probability of civil liability for the People of the State of Oregon, as well as a high probability of civil and criminal liabilities for the employees of certain agencies/private companies of the State of Oregon.

## III. FACTUAL BACKGROUND

1. On December 5th, 2012 the Oregon Senate Interim Committee on Environment and Natural Resources announced the agenda of their upcoming Work Session slated for December 11th, 2012. This interim committee consisted of Senator Jackie Dingfelder, Senator Alan Olsen, Senator Mark Hass and Senator Floyd Prozanski. Included on the committee's agenda was Legislative Concept 2125. The proposal, which was the forerunner of Oregon Senate Bill 115, would declare an emergency prohibition of "*placer mining using any form of motorized equipment or motorized dredge*" in the State of Oregon and sought to criminalize independent mining by imposing a "*maximum of one year's imprisonment or $6250 in fines, or both*".

2. Starting on December 6th, 2012, Galice Mining District began the process to alert locatable mineral miners of this attack on locatable mineral mining in the State of Oregon by issuing and circulating a press release entitled "The New War on Independent Mining in Oregon – LC 2125" **(Exhibit A)** Chief Executive Officer :kerby-dale: of the Galice Mining District remarked in the release that "*there seems to be a recurring theme in this draft that suggests that miners who are not self-described 'recreational miners', as defined in ORS 517.120, are going to be imprisoned and fined if they are using any type of mechanical equipment, including a suction machine, on their claim without having a Notice of Intent or Plan of Operation that has been approved by BLM or USFS in place. As many miners are aware, the basic policy of the agencies has been that certain types of mechanical mining equipment do not require a Notice of Intent or a Plan of Operation and the State of Oregon has no lawful authority to impose its will on the agencies any more than it does upon the miners. In addition, the draft absolutely forbids the use of mechanized equipment on unappropriated lands managed by the United States. Ultimately, this means that the State of Oregon is attempting to restrict the prospecting methods of a miner attempting to make a legitimate discovery on unappropriated lands to the limitations of a gold pan. Much the same way, it attempts to restrict those miners who choose not to make a location from doing anything more than prospecting with a pan. That constitutes a prohibition and is an outrage. Basically, the draft violates federal law as the legislature of this state is expressly forbidden from interfering with the will of Congress. Another very alarming problem lies in the fact that the draft does not enumerate upon mining activity on patented property. This suggests that anyone mining on a patented claim with more than a hand sluice or a gold pan will be subject to imprisonment and, or fines. All in all, what*

*we are seeing is that there are public servants inside the State of Oregon who are pushing to totally destroy the right to mine."* :kerby-dale: also pointed out that the draft places strict limitations on when and where miners may mine on rivers, creating a prohibition on mining within 500 feet of any residence, campground or area designated for swimming."

3. This same day, December 6th, 2012, representing Galice Mining District in his official capacity :kerby-dale: contacted by e-mail **( see Exhibit B)**, Kristi Hauck, who was then Committee Assistant for the Oregon Senate Environment and Natural Resources Committee, in regards to LC 2125 (later known as SB 115). :kerby-dale: informed Hauck that he had been receiving e-mails and phone calls from miners across the country who were very alarmed about LC 2125 and its effect on their rights and property. :kerby-dale: requested more information on the bill including the identity of the sponsors thereof; he finished by "*requesting insight into how the mining community, its related organizations and our organized mining districts may best communicate with the Committee regarding this issue.*"

4. On December 18th, 2012, :kerby-dale: received a response (**Exhibit C**) from Beth Patrino who identified herself as being with the Legislative Committee Services of the State of Oregon. Patrino stated "*The types of reviews your email identified – the Attorney General's Office, etc. – have not yet taken place*" and she indicated that such would not take place until sometime in February of 2013. None of the concerns regarding the legality of the bill or other requests for information were addressed.

5. In the meantime, members and officers of Galice Mining District were active in contacting other organizations regarding LC 2125 and a "united front" was established amongst the major mining groups in the Far Western States.

6. By early January, LC 2125 had become Oregon Senate Bill SB 115. Like LC 2125, the author of the bill was unidentified and remains a source of speculation in the mining community. At the same time, SB 401 also appeared, both of which were authored by Senator Alan Bates. SB 115 "*Prohibits placer mining using any form of motorized equipment or motorized dredge. Punishes by maximum of one year's imprisonment, $6,250 fine, or both. Declares emergency, effective on passage.*" SB 401 "*Designates certain rivers and creeks as scenic waterways. Declares emergency, effective on passage.*" Included in the bill is a provision to classify a majority of the major gold bearing streams in Southern Oregon and elsewhere in Oregon as state scenic waterways, including many which are located upon the Public Domain of the United States that are currently lawfully appropriated by locatable mineral miners under the Act To Promote The Development of the Mining Resources of

the United States of 1872. These include, but are not limited to Sucker Creek, Silver Creek, Briggs Creek, Grave Creek, Josephine Creek, Rough and Ready Creek and the Illinois River in Josephine County, Cow Creek in Douglas County, the Little Applegate River and Applegate River in Jackson County, which are located within the boundaries of the Galice Mining District and constitutes a large portion of South Western Oregon's locatable mineral wealth. Hundreds of locatable mineral deposit mining claims that are lawfully appropriated under the 1872 Act are found on these waterways. Also impacted would be considerable amounts of private property on the Applegate, Rogue, Illinois and Umpqua Rivers in South Western Oregon, including large portions of the city limits of the cities of Cave Junction on the Illinois River, Roseburg on the Umpqua River and Grants Pass, Rogue River and Gold Hill on the Rogue River. Analysis of SB 401 by Galice Mining District and other mining organizations promptly established that the bill was apparently intended to attack the rights and property of miners, for the Oregon Scenic Waterways Act and related Oregon Revised Statutes specifically prohibit placer mining within one quarter of a mile of the designated waterway. It was also established that the bill had adverse impacts upon private property rights and the liberties of private property owners.

7. It is the position of Galice Mining District that these bills are not only unlawful and unconstitutional, but also constitute possible criminal activity. Galice Mining District promptly issued an "action alert" to the mining community entitled "Alan Bates Launches New Attack on Mining, Property and Water Rights" (**Exhibit D**) and also another "alert" (**Exhibit E**) suggesting that miners report Bates to the United States Department of Justice Civil Rights Division, the Portland Federal Bureau of Investigation and Congress to reign his activities in if they felt that their rights and property were under an unlawful attack. The mining district also, at great expense, printed and distributed thousands of flyers about the legislation.

8. On January 18th, 2013, Galice Mining District, together with eight other mining organizations including the Western Mining Alliance (Nevada), Public Lands For The People (California), The New 49ers (California), North West Mineral Prospectors (Washington), Douglas County Prospectors Association, Millennium Diggers, Willamette Valley Miners Association and the Waldo Mining District (all of Oregon), issued a joint legal notice (**Exhibit F**) to Senator Alan Bates regarding his legislative activity. The notice reminded him that miners have a statutory right, not a mere privilege, to go upon the Public Domain of the United States for the purpose of appropriating and developing locatable minerals and that the states may not unreasonably restrict, nor prohibit the

exercise of this right. The notice added that "*Federal law is clear; the States may not prohibit mining*" and cited several decisions by the U.S. Supreme Court. Also included was additional information on suction dredge mining and scientific studies on the subject conducted by federal and state agencies. Copies of the joint notice were also copied to the entire body of the Oregon State Senate and made publicly available. To date, neither Senator Alan Bates, nor any other agent of the State of Oregon has responded to this notice.

9. On January 21st, 2013, a miner and natural resources activist from Grants Pass, Oregon named Mark Johnson sent an e-mail (**Exhibit G**) to Senator Alan Bates entitled "The community requests Transparency. Who is backing the mineral withdraw?" that was also copied to representatives of Galice Mining District, Waldo Mining District, Jefferson Mining District and also The New 49ers. Johnson publicly asked Bates to disclose the truth about who was pushing him to write anti-mining legislation and asked him if he had to file a Freedom of Information Act Request to find out that information. Jackson publicly responded to all the recipients, stating that he had questions of his own for Bates about the legislation and he then issued a fierce challenge of Bates's lawful authority to violate numerous federal and state laws. :kerby-dale: challenged Bates on nine points of authority and jurisdiction, adding that he did not "*have lawful authority to do any of the above, and your attempts to deprive miners (and others) of their rights and their property, and to attempt to criminalize their Congressionally granted rights for your political agenda constitutes constructive trust fraud, a deprivation of rights, attempted extortion of real estate and unlawful interference with federally protected rights and activities. I am aware, Senator, that not all men in the State of Oregon are actually created equally and that you have certain immunities as a legislator. That being said, I am also aware that this immunity is also limited. Be aware, Mr. Bates, it is my opinion that you are committing felonies under Federal Law, from which you are NOT immune from prosecution, let alone are you immune from any torts arising from said felonious activities. Also be reminded, that when you act outside of your lawful authority, that you are the one who will be responsible to foot your legal bill - not the people of this state. That above being taken into consideration, how is your activity not sedition and not treason, as defined in current United States Title Code? I suggest that you study those provisions of Federal law. Mr. Bates, this is neither a joke, nor an idle threat. This is, in fact, a very serious matter. Understand that all lawful remedy and lawful options are considered to be ON THE TABLE in this matter. I hope you understand that we are so adamant about this*

*position that miners across the entire country are calling for Congressional intervention in your attempt to deprive them of their granted rights and mineral estate property which derived from Congressional authority. You will recall that I publicly suggested that you consult with an attorney if you did not understand the civil and criminal ramifications of your current activity. Again, I would stress the importance of you doing just that.*" While Bates did not respond to the notice, Mark Johnson promptly forwarded :kerby-dale:'s notice to numerous state and county officials, as well as to the local press and other interested parties, stating that "*The Galice Mining district states the laws. Facts are facts. Oregon and Federal courts have upheld repeatedly, that mineral rights are fee simple property rights. Legislators and individual lobbyists are not immune from personal tort laws, are they?*"

10. On January 22nd, 2013, acting in his official capacity for Galice Mining District, Jackson sent notice to both Courtney and Dingfelder (**Exhibit H**) regarding the SB 115, expressing not only his concern about the legality of the bill, but also a demand that the anonymous sponsor be identified. Jackson gave notice that SB 115 therefore did not comply with Oregon Senate Rule 12.01, which requires that the sponsor of each bill be plainly identified. He also gave notice to both respondents "*Mr. Courtney, as the President of the Oregon Senate, please see that the sponsor of SB 115 is either clearly identified or that the bill is stricken for non-compliance. Ms. Dingfelder, as the Chair of the committee responsible for reviewing SB 115, please insure that your committee is not approving legislation that fails to conform to Senate Rules, let alone those that attempt to criminalize federally protected rights or that violate other Federal Laws.*" Neither Courtney, nor Dingfelder, nor any of their staff, responded to the notice.

11. Three days later, on January 25th, 2013, pursuant to Chapter 192 of the Oregon Revised Statutes, :kerby-dale: submitted Public Record Requests (**Exhibit I**) to both Courtney and Dingfelder to obtain "*digital copies of all records, notes, recommendations, legal examinations, minutes of meetings and internal and external correspondences pertaining to Senate Bill 115, titled, Relating to placer mining; creating new provisions; amending ORS 196.910 and 390.835; and declaring an emergency. (Also requested is) the identity of the author(s), contributors and sponsor(s) of Senate Bill 115 which have been kept in anonymity by the Senate of the State of Oregon.*" The same Public Record Requests bearing the official Galice Mining District seal was also mailed to the two senators as official notice from the Galice Mining District Recorder. (**Exhibit I**)

12. On February 4th, 2013, a response (**Exhibit J**) was received regarding the Public Records Request made

to Courtney's office from a Dexter A. Johnson identifying himself as being a Legislative Counsel. Despite the fact that Galice Mining District had been actively requesting the identity of the sponsor of LC 2125/SB 115 since December 6th, 2012, Johnson stated that as the legislature had been in session for two weeks, the Courtney was not obligated to adhere to the Public Records Request and also added that Courtney's office was not in possession of the requested records. For the record, the petitioners find it hard to believe that the President of the Oregon State Senate, his staff and his Legislative Council are unaware of who the author of SB 115 is, especially after a receiving a request that Courtney insured that the bill conform to Senate Rules.

13. On January 30th, 2013, :kerby-dale: received an e-mail (**Exhibit K**) from an Emily Brandes in Legislative Administration that responded to the request made of Dingfelder's office, which assigned a Public Records Request Number (PRR 260) and also included a communication from one Kevin Hayden, also of Legislative Administration that acknowledged receipt of the request. On February 15th, 2013, Hayden followed up (via Brandes) with a cost estimate of $56.91, asking Jackson to follow up if he would like to proceed. After requesting the expenditure from the miners within Galice Mining District and obtaining their subsequent approval, on February 22nd, 2013, Jackson notified Brandes that the fee was acceptable, that the Records Request be processed and asked for confirmation of where to submit the payment. As of this writing, over a month and a half later, no other contact regarding this matter has been received. While the petitioners are outraged over the the idea of having to pay a fee to learn the identity of a bill sponsor when the name of the sponsor is required to be listed on the bill under Oregon's Senate Rules, it is doubly outrageous that Dingfelder's office appears to be so deceptive about the identity of said sponsor that they are unwilling to adhere to the Public Records laws of the State of Oregon after offering to fulfill the request for a fee.

14. In the meantime, Galice Mining District and other organizations were actively rallying opposition to the bills in question. On February 28th, 2013, an estimated 300 to 400 miners protested against the bills on the front steps of the Oregon State Capital at Salem, Oregon, despite the fact that the event was only conceived by two Salem area miners five days earlier. Along with officers from Waldo Mining District, North West Mineral Prospectors, Millenium Diggers and Willamette Valley Miners Association,: kerby-dale: addressed the crowd of miners that had gathered. Other speakers included a representative from Oregon Citizen's Lobby and state senators Herman Baertschiger Jr., Alan Olsen and Ted Ferrioli, as well as state representatives Wally Hicks and Brad Witt.

15. On March 5th, 2013, Galice Mining District issued notice of violations and an intent to pursue legal remedies (**Exhibit L**) to the State of Oregon, John Kitzhaber, Peter Courtney, Jackie Dingfelder and Alan Bates, offering the respondents an opportunity to rebut the contents. As with earlier notices, no response was forthcoming from the respondents.

16. Meanwhile, miners from around the country were actively sending in e-mails, letters and phone calls and garnering support against the bills, in particular, against SB 401 which might adversely impact people's private property. In addition to several state senators coming out publicly against the bill, the Board of County Commissioners of Josephine County, Oregon passed a resolution opposing it.

17. As if in an attempt to finish off the miners once and for all, Bates and Dingfelder, through the Senate Committee of Environment and Natural Resources, on or about April 4th, 2013, introduced yet another bill in the guise of SB 838 which "*Imposes moratorium on certain mining using any form of motorized equipment. Punishes by maximum of one year's imprisonment, $6,250 fine, or both. Sunsets January 2, 2018. Directs Governor's office to study certain issues related to mining using motorized equipment. Declares emergency, effective on passage.*"

18. In response to such a blatant attack on the rights of locatable mineral miners, their livelihoods, their granted property and the Mining Law, coupled with "we do as we please, regardless of the law" attitude of the Respondents, at a meeting of the Galice Mining District held at Grants Pass, Oregon, on Sunday, April 7th, 2013, the miners that comprise this mining district voted unanimously to petition the United States to enjoin the State of Oregon's attack on our rights.

## IV.    ARGUMENT

**A.** Galice Mining District is Entitled to A Restraining Order and an Emergency Preliminary Injunction requiring the State of Oregon to vet the lawfulness of the proposed legislation.

1. The Petitioners are entitled to a restraining order and a preliminary injunction compelling the State of Oregon and its agents to adhere to Federal Law and the will of Congress. Galice Mining District, et. al. is likely to prevail on its merits, and certain to suffer irreparable injury if this motion is not granted. The Court must act now to prevent injury to the Petitioners and the public. The prospect of harm to the respondents is low if the motion is granted, and the public interest strongly

favors Galice Mining District's motion.

2. The Petitioners' motion asks this court to prevent the State of Oregon, et. al. from exceeding its lawful authority to usurp Congressional Authority, the Supremacy and Contract Clauses of the United States Constitution, and to prevent the State from criminalizing a protected statutory right of the People of the United States to explore, extract and develop the locatable mineral deposit resources located upon the Public Domain of the United States, as well as upon the Appropriated Domain of the United States and private mineral properties that were originally secured by way of a Land Patent from the United States.

**B.** Galice Mining District is likely to prevail on its merits.

1. Federal Law, as well as the courts, have made it crystal clear: the states may not pre-empt the authority of Congress to dispose of land, they do not control the Public Domain of the United States, nor the waters upon it, and they shall not create prohibitions against mining. Such ex post facto laws are specifically forbidden by the Constitution for the United States, as well as the Constitution for the State of Oregon.

2. For this reason, Galice Mining District, its officers and the miners they represent, would be likely to prevail in any actions against the State of Oregon and any of this agents regarding any action that derives from this unlawful legislation.

**C.** Hundreds of miners and other property owners will face Irreparable Damage Absent Injunction.

1. While it is difficult to firmly establish an exact number of mining claims and mining claim owners who will be harmed by the legislation, particularly by SB 401, according to information compiled from the Department of Interior's website LR2000.com, which contains public data compiled by the Bureau of Land Management on mining claim ownership, best estimates indicate that somewhere between 496 and 565 mining claims will be adversely effected by the legislation in question. The vast majority of these claims exist in Josephine County, Oregon alone (between 319 and 388) and the vast majority of the affected claims statewide exist inside the lines of the Galice Mining District (between 384 and 454). In excess of 95% of these claims are placer claims and a large majority of those are Association type placer claims exceeding more than 20 acres.

2. Association claims are those placer claims which are located by groups of miners, with individual each miner locating 20 acres of ground in his or her name, up to a maximum of 160 acres being located by eight (8) granted. While it is nearly impossible, nor practical, for the Petitioners to determine how many miners will actually be affected, it is reasonable to suggest that the number is between 1000 and 4294. Under SB 401, which specifically forbids placer mining inside of a State Scenic Waterway, these miners will be unable to exercise their exclusively possessed mining rights, their mining incident enjoyment of the surface, their exclusive right to the mineral therein, their exclusive right to benefit from its extraction and ultimately their right to develop the claim to the point that they might one day acquire absolute title to the land from the United States government.

3. It is imperative to mention, that in order for each claimant to continue to lawfully hold their rights to their mining claim, an annual assessment in the guise of mining incident work must be performed in accordance to federal and state statutes, as well as the local rules, regulations and customs of the respective mining district. While a deferment of labor can be sometimes granted by the Bureau of Land Management in certain circumstances, these deferments are rare and require a determination to be made by BLM on a case by case basis. It is reasonable to assume that if the illegal legislation becomes ex post law for even a year, many miners could lose their claims if they adhere to the terms of the legislation.

4. The courts, as well as the State of Oregon, have long made it clear that a mining claim is a form of real estate and constitutes a unique form of property that is subject to the protection of the 5th Amendment. The legislation in question makes it quite clear that the sponsors believe that they are acting in the public interest, yet no provision has been made to offer any miner just compensation for their loss of property, let alone their rights and livelihood. This legislation would constitute a regulatory takings, if not an outright conspiracy to extort the unique mineral properties of the afflicted miners.

5. Also at stake is the investment that the miners within the Galice Mining District have individually made to not only develop their mineral properties, but also to purchase or construct equipment, which on an individual basis may range from hundreds to tens of thousands of dollars.

**D.** There is little possibility of harm to Respondents if Relief is Granted and the Balance of Harm Weighs in Favor of the Petitioner.

1. While the Respondents allege that they have concerns about the environmental effects of mining,

they themselves have no possibility of suffering a harm if relief is granted to the Petitioners. The Respondents have no property, protected rights, nor a livelihood at stake. In fact, if relief is granted, an injunction would actually seriously curtail the possibility of harm to the Respondents, who are already the focus of many planned civil actions from the mining community of this state. By contrast, the Petitioners and the miners which they represent, stand to suffer irreparable harm to their protected rights, property and livelihood.

**E.** There is a strong Public Interest in Granting Petitioner's Motion.

1. The 1872 Mining Act is the guiding principle and law so far as locatable minerals upon the Public Domain of the United States. This Act of Congress, constitutes a public grant from the United States to the People of the United States, stating in part (**30 USC 22**) that: "*That all valuable mineral deposits in lands belonging to the United States, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase, by citizens of the United States and those who have declared their intention to become such. under regulations prescribed by law, and according to the local customs or rules of miners, in the several mining-districts, so far as the same are applicable and not inconsistent with the laws of the United States*". Thus, every "*citizen of the United States and those who have declared their intention to become such*" has a strong interest in a motion that is seeking to defend a body of Federal Laws enacted by Congress that grants a right to all to seek out and extract valuable mineral deposits from the Public Domain of the United States, for their individual benefit and enrichment. Congress has recognized, not only in the 1872 Act, but also the National Materials and Minerals Policy, Research and Development Act of 1980 (**30 USC 1602**), that the extraction and development of the nation's mineral resources is integral to the financial and strategic welfare of the nation and its people.

2. The National Materials and Minerals Policy, Research and Development Act of 1980 declares in part that "*it is the continuing policy of the United States to promote an adequate and stable supply of materials necessary to maintain national security, economic well-being and industrial production with appropriate attention to a long-term balance between resource production, energy use, a healthy environment, natural resources conservation, and social needs.*"

3. The court system of this country has long recognized that Congress, through the Acts of July 26th, 1866, March 17th, 1870 and May 10th, 1872, amending a "present grant", conveyed the

unappropriated mineral estate of the United States to its citizens, and those who have declared their intention to become citizens.

4. The Act of 1866 clearly states "*That the mineral lands of the public domain, both surveyed and unsurveyed, are hereby declared to be free and open to exploration and occupation by all citizens of the United States, and those who have declared their intention to become citizens*".

5. Though it is often argued that the Act of 1872 repealed the Act of 1866, the Act of 1872 did nothing to change the official mineral policy of the nation.

6. As Judge Lindley wrote in his famous work, "Treatise on American Mining Law", *"The act of 1866 was, in effect, a proclamation severing veins and lodes of the character specified from the body of the public domain. It was the announcement of a policy, whereby ledges within the earth were to be considered as distinct entities, and to be dealt with as such in administrating the public land system. This policy has never changed. It is as much a part of the existing law as it was of the one which it succeeded."*

7. Or as found in Rawson vs. USA, "*Representative Sargent who fathered the 1872 bill and was in charge of it in the House said that "the bill does not make any important changes in the mining laws as they have heretofore existed. It does not change in the slightest degree the policy of the Government in the disposition of the mining lands*." Cong. Globe, 42nd Congress, 2nd Sess., p. 534." - **Rawson v. USA** 225 F.2d 855

8. Much the same way, Barringer and Stokes in "The Law of Mines and Mining" (1897) state that "*by the Act of July 26,1866, the policy of reserving mineral land from sale or grant was changed. That act declared that the mineral lands of the public domain were free and open to exploration and occupation by all citizens of the United States. The act of May 10, 1872 ..., repealed several sections of the Act of 1866 (but enacted in its place) a provision declaring that all valuable mineral deposits in lands belonging to the United States ... were free and open to exploration and purchase ... subject to the conditions named in the original act*".

9. While there is sometimes debate today about what Congress intended, there was no misunderstanding when HR 365 was introduced to the House in mid 1866. Even the strongest adversary to the bill, Representative George Julian of Indiana, spoke very plainly about what the writers of the bill intended, saying in part that it was "*revolutionizing the whole land policy of the Government, abdicating in the name of the Nation its authority and jurisdiction over the richest*

*mineral possessions on the face of God's earth*".

10. As the Second Pan American Scientific Congress explained it in 1917, "*This was not only the first mining law enacted by the Central Government, but it was the first instance where a sovereign broke away from the old regalian right and voluntarily ceded to her citizens as a gift all her mineral wealth on the sole condition that the citizen should go out and possess it.*"

11. As was found in **Ivanhoe Mining Co. vs. Consolidated Mining Co. (102 US 167)**, the government "*forever abandoned the idea of exacting royalties, instead giving free license to all citizens*".

12. This gift of the valuable minerals to the American people is nothing short of a grant and the court system has long recognized this fact.

## F. Mining Claims are Property protected by the 5th Amendment:

1. In **Belk vs. Meagher**, it was recognized that "*the locator of a mining claim has a possessory title thereto, and the right to the exclusive possession thereof. The words imply property. The right to the exclusive possession and enjoyment of a mining claim includes the right to work it, to extract the mineral therefrom, to the exclusive property in such mineral, and the right to defend such possession. The right to the exclusive possession and enjoyment of property, accompanied with the right to acquire the absolute title thereto, presupposes a grant, and the instrument of this grant, as applied to mining claims upon the public lands, is the act of congress above referred to. This act being of general application to all the mineral lands belonging to the government, and conferring a title or easement therein upon the locator thereof, and vesting the right in him to become the absolute owner to the exclusion of all others, is a legislative grant, and being given by act of congress, is equivalent to a patent from the United States to the same.*"

2. This fact was also recognized in **Robertson vs. Smith, 1 Mont. 410** in that "*The grants made by the Congress in the Mining Law of July 26, 1866, should be liberally construed in favor of the grantee; and the grant of the right to occupy and explore the mineral lands of the United States carries with it the implied right to extract the precious metals found by the occupant and explorer*".

3. Miners have a constitutionally protected right to go upon the Public Domain of the United States to search for locatable minerals, as well as the right to appropriate them for their exclusive possession and for their exclusive financial benefit. The rights of miners that were granted to them

by Congress also include the right to extract the locatable minerals which were granted to them.

4. In the famous Shumway case, the 9th Circuit Court of Appeals ruled that: "*The owner of a mining or mill site claim does not need a patent, or a vested right to issuance of a patent, to possess and use the property for legitimate mining or milling purposes. A mining or mill site claim is "property in the fullest sense of the word.*"

5. Much to this end, the same court, in **Swanson v. Babbit**, ruled: "*mining claims are `private property' which enjoy the full protection of the Fifth Amendment.*"

6. We need only study the landmark case of Fletcher vs. Peck, 10 US 87, to understand this. As Chief Justice John Marshall said in that case "*A law that negates property rights established under an earlier law is unconstitutional for violating the Contract Clause (Article I, Section 10) of the United States Constitution.*" He went on to rule that **public grants are contractual obligations that can not be abrogated** even to the point that "*a repeal of the law cannot divest those rights*" because they are considered to be protected by several provisions in the United States Constitution.

7. In particular, the court ruled that: "*The State legislatures can pass no ex post facto law. An ex post facto law is one which renders an act punishable in a manner in which it was not punishable when it was committed. Such a law may inflict penalties upon the person, or may inflict pecuniary penalties which swell the public treasury. The legislature is then prohibited from passing a law by which a man's estate, or any part of it, shall be seized for a crime which was not declared by some previous law to render him liable for punishment.*"

8. The Constitution of the State of Oregon also reaffirms the findings in Fletcher v. Peck, Section 21 of the document, declaring that: "*No ex-post facto law, or law impairing the obligation of contracts shall ever be passed*".

9. Both the Bureau of Land Management and the United States Forest Service, whom are entrusted with managing the Public Domain of the United States are open about the fact that miners have a right to exploit the locatable mineral resources of the nation.

10. In their publication, "Anatomy of a Mine From Prospect To Production" (United States Forest Service, General Technical Report INT-GTR-35, February 1995) USFS recognizes that '*The claim locator has the right to prospect, develop the mineral potential, do assessment work and perform other acts related to exploration …the government must not endanger or materially interfere with prospecting, mining or processing or uses reasonably incident to*".

11. Meanwhile, in **43 CFR § 3802.0-6**, a provision of BLM's guiding principles relating to mining claims, it states: "Under the 1872 Mining Law (30 U.S.C. 22 et seq.), a person **has a statutory right consistent with other laws** and Departmental regulations, to go upon the open (unappropriated and unreserved) public lands **for the purpose of mineral prospecting, exploration, development, and extraction**."

12. While the Petitioners respect that the respondents may have concerns about the potential for environmental harm that may be caused by mining, in the famous case **US v. Shumway (No. 96-16480)**, the 9th Circuit had this to say of the Mining Law: *"Despite much contemporary hostility to the Mining Law of 1872 and high level political pressure by influential individuals and organizations for its repeal, all repeal efforts have failed, and it remains the law. The locators of all mining locations...so long as they comply with the laws (governing location) shall have the EXCLUSIVE right of possession and enjoyment of ALL surface located within the lines of their location. When the location of a mining claim is perfected under the law, it has the effect of a grant by the United States of the right of present and exclusive possession. The claim is property in the fullest sense of the term ... The owner of a mining claim owns property, and is not a mere social guest."*

13. In the same vein, in **Freese v. United States, 639 F.2d 7540**, the court ruled, *"It is a matter beyond dispute that federal mining claims are "private property" enjoying the protection of the fifth amendment. Judge Finesilver of the federal district court has nicely summarized the applicable concepts: A mining claim is an interest in land which cannot be unreasonably or unfairly dissolved at the whim of the Interior Department. Once there is a valid discovery and proper location, a mining claim, in the language of the Supreme Court, is "real property in the highest sense." Legal title to the land remains in the United States, but the claimant enjoys a valid, equitable, possessory title, subject to taxation, transferable by deed or devise, and otherwise possessing the incidents of real property."*

## G. The Right To Mine

1. In **Belk vs. Meagher (1878) 3 Mont. 65, 78**. it was recognized that "*The right to the exclusive possession and enjoyment of a mining claim **includes the right to work it, to extract the mineral therefrom, to the exclusive property in such mineral**, and the right to defend such possession.*" Also see Tibbitts v. Ah Tong (1882) 2 Pac. 759, 4 Mont. 536, 547.

2. In **Robertson vs. Smith, 1 Mont. 410** it was ruled that *"the grant of the right to occupy and*

*explore the mineral lands of the United States **carries with it the implied right to extract the precious metals found by the occupant and explorer"**.*

3. The Oregon-Washington State BLM office, in its mining claim circular remarks, "*A mining claim is a parcel of land for which the claimant **has the right to develop and extract a discovered, valuable, mineral deposit.***"

4. In Joseph Wesley Thompson's, United States Mining Statutes Annotated, Volume 1, he remarks that "The Act grants to a miner who locates a particular portion of mining land in accordance with the local rules and customs of miners, the right over the ground located and is **a grant from the General Government to occupy, explore and take therefrom the precious metals.**"

5. Even the Center for Environmental Equity, an environmentalist group based in Portland who calls for "reform" of the 1872 Mining Act, understands that miners have a right to mine, stating that "*the 1872 General Mining Law remains the template for the mining of nearly 500 million acres of pubic domain lands. Under the 1872 Law, miners who claim minerals on federal public lands—not public policy makers—decide when, where, and how to mine. **The 1872 Law grants an absolute right to mine***".

6. Much the same way, the Arizona Chapter of the Sierra Club remarks *"**The federal government treats mining as a right** on public lands - one that trumps other uses."*

7. Finally, in 1873, the Oregon Supreme Court found, in **Gold Hill Quartz Mining Co. vs. Ish, 5 Oreg. 104**, that "*it is clear that by the act, the General Government extended to all in possession of mining claims, and to all subsequently locating and denouncing mines containing the precious metals, **a guarentee of protection"**.*

## H. States and other Local Governments May Not Prohibit or Create Unreasonable Regulations Pertaining to Mining

1. Oregon's Senate Bills SB 115, SB 401 and SB 838, which are proposed by the Respondents, contain prohibitions that are entirely inconsistent with numerous Federal Laws and the official policies of the nation and its agencies.

2. Both SB 115 and SB 838 create state regulations that have the effect of prohibiting metals mining in the State of Oregon. While SB 115 creates a prohibition with certain exceptions, SB 838 defiantly creates a blanket prohibition on all forms of motorized placer mining inside the State Of Oregon.

3. The summary of SB 115 reads: "*__Prohibits placer mining__ using any form of motorized equipment or motorized dredge. __Punishes by maximum of one year's imprisonment, $6,250 fine, or both.__ Declares emergency, effective on passage.*"

4. Meanwhile, SB 838 is summarized as: "*__Imposes moratorium on certain mining__ using any form of motorized equipment. __Punishes by maximum of one year's imprisonment, $6,250 fine, or both.__ Sunsets January 2, 2018. Directs Governor's office to study certain issues related to mining using motorized equipment. Declares emergency, effective on passage.*"

5. While the bills are apparently intended to mainly target the use of so-called "suction dredges" to extract placer gold, it is important to mention that the use of language in the bills would actually target all types of placer mining utilizing motorized equipment. In lay terms, placer mining is typically defined as the extraction of any type of mineral or mineral material that has broken free from a deposit in the host rock. This includes not only a long list of locatable minerals, which include, but are not limited to "Gold, Silver, Nickel, Copper, Lead, Zinc, Iron, Uranium, Vanadium, Molybdenum, Manganese, Cobalt, Beryllium, Tungsten, Zeolites, Silica, Perlite, Mica, Block Pumice (one dimension of 2" or more), Limestone of chemical or metallurgical grade, Gypsum, Barite, Fluorspar (and) Gem minerals" (source: New Mexico BLM, "Locatable Minerals", January 2006), but can also include gravel and other types of aggregate materials that are used in the construction of roads and buildings. Most of these minerals exist in both placer and lode deposits. While the respondents may only have intended to target placer gold, their use of such broad terminology such as "placer mining" and "motorized equipment" will have a complete and

utter destroying effect on Oregon's already struggling mining industry.

6. It is notable that in addition to failing to create protection for the rights of miners who are operating under the 1872 Mining Act, let alone for their property rights, both bills impose severe punishments for those miners who will continue to exert their rights and to attempt to protect possession of their mineral properties. Ultimately, the bills will criminalize rights that for nearly 150 years have been protected under the Laws of the United States. In addition, the petitioners charge that the penalties that the respondents wish to impose constitute a cruel and unusual punishment.

7. Both pieces of legislation will issue a Class A Misdemeanor charge and impose up to a year in prison and a fine of $6250 upon miners who continue to exercise their federally protected rights. These punishments are equal to those imposed in the State of Oregon for Theft in the second degree (ORS 164.045), Criminal trespass while in possession of a firearm (ORS 164.265), Unlawful entry into a motor vehicle (ORS 164.272), Criminal mischief in the second degree (ORS 164.354), Strangulation (ORS 163.187), Recklessly endangering another person (ORS 163.195), Criminal mistreatment in the second degree (ORS 163.200), Unlawful use of an electrical stun gun, tear gas or mace in the second degree (ORS 163.212), Sexual abuse in the third degree (ORS 163.415), Child neglect in the second degree (ORS 163.545) and a long list of other Class A Misdemeanors.

8. It appears that the Respondents would like to punish miners to such an extent that they consider the miners who are exercising their federally protected rights as equal or greater criminals than those who might wantonly injure property or other persons, including children. Even if the bills were lawful, these punishments seem rather extreme, if not vicious and cruel when one considers that the bills would also destroy the livelihoods, rights and property of the miners.

9. The Petitioners charge that the Respondents are a step away from the violating the Eighth Amendment of the United States Constitution by attempting to level excessive fines and punishments on miners that are exercising their lawful rights. This provision reads "Excessive *bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.*" While intended to limit the Federal Government, the Supreme Court has ruled repeatedly that it applies equally to the States as well.

10. Over the recent decades, the courts have ruled on a large number of cases that involve state

and local governments attempting to create prohibitions on mining activity by means of legislation and ordinance. All the cases that the Petitioners are aware of, indicate that while the state **may** have the right to create reasonable regulations to protect the welfare of others, the courts have clearly indicated that federal, state and local rule-making shall not create unreasonable or prohibitory regulations that erode the right of the people to mine.

11. In SOUTH DAKOTA MINING ASSOCIATION, INC. v. LAWRENCE COUNTY, a Political Subdivision of the State of South Dakota, (United States Court of Appeals, Eighth Circuit; Decided Sept. 16, 1998); the court explained at length that: *"**Holders of mining claims brought suit claiming that federal mining laws preempted ordinance prohibiting issuance of any new or amended permits for surface metal mining within area which included federal lands**. Private landowner intervened to defend the ordinance. The United States District Court for the District of South Dakota, Richard H. Battey, Chief Judge, 977 F.Supp. 1396, granted summary judgment for plaintiffs and enjoined the ordinance. Intervener appealed. The Court of Appeals, Hansen, Circuit Judge, held that: (1) preemption claim was ripe, and (2) Federal Mining Act preempted ordinance."Affirmed. Plaintiff who challenges statute must demonstrate realistic danger of sustaining direct injury as result of statute's operation or enforcement. Plaintiff does not have to await consummation of threatened injury before bringing declaratory judgment action; instead, action is ripe for adjudication if plaintiff faces injury that is certainly impending. Claim by holders of mining claims that federal and state mining laws preempted ordinance prohibiting issuance of any new or amended permits for surface metal mining within particular area was ripe, even though claim holders had not sought such permits; claim holders had realistic danger of sustaining immediate, direct injury as result of operation or enforcement of challenged ordinance, and applying for permit would have been exercise in futility. U.S.C.A. Const. Art. 6, cl. 2; 30 U.S.C.A. §§ 21-26. If Congress evidences intent to occupy given field, any state law or local ordinance falling within that field is preempted. U.S.C.A. Const. Art. 6, cl. 2. If Congress has not entirely displaced state regulation over matter in question, state law is still preempted to extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where state law stands as obstacle to accomplishment of full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2. The Lawrence County **ordinance is a per se ban on all new or amended***

*__permits for surface metal mining within the area__. Because the record shows that surface metal mining is the only practical way any of the plaintiffs can actually mine the valuable mineral deposits located on federal land in the area, the ordinance's effect is a de facto ban on mining in the area. Thus, unlike Granite Rock, we are not faced with a local permit law that sets out reasonable environmental regulations governing mining activities on federal lands. __The ordinance's de facto ban on mining on federal land acts as a clear obstacle to the accomplishment of the Congressional purposes and objectives embodied in the Mining Act. Congress has encouraged exploration and mining of valuable mineral deposits located on federal land and has granted certain rights to those who discover such minerals. Federal law also encourages the economical extraction and use of these minerals__. The Lawrence County __ordinance completely frustrates the accomplishment of these federally encouraged activities. A local government cannot prohibit a lawful use of the sovereign's land that the superior sovereign itself permits and encourages. To do so offends both the Property Clause and the Supremacy Clause of the federal Constitution. The ordinance is prohibitory, not regulatory, in its fundamental character__. The district court correctly ruled that the ordinance was preempted."*

12. Much the same, in **Ventura County v. Gulf Oil Corp. (1979)**, the U.S. 9th Circuit ruled: "*In view of extensive regulation of oil exploration and drilling under Mineral Leasing Act, specific use of federal lands was authorized by federal government, and __county could not prohibit that use, either temporarily or permanently, in attempt to substitute its judgment for that of Congress, and thus could not require oil company to secure open space use permit on conditions determined appropriate by county__. Mineral Lands Leasing Act, §§ 1 et seq., 32, 30 U.S.C.A. §§ 181 et seq., 189; U.S.C.A.Const. art. 4, § 3, cl. 2.*"

13. In **Kleppe v. New Mexico, 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34, 45 (1976)**, the United States Supreme Court stated: "*__Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause__. As we said in*

*Camfield v. United States, 167 U.S. 518 at 526, 17 S.Ct., 864 at 867, in response to a somewhat different claim: "__A different rule would place the public domain of the United States completely at the mercy of state legislation.__"* The Court later continued: *"The Federal Government does not assert exclusive jurisdiction over the public lands in New Mexico, and the State is free to enforce its criminal and civil laws on those lands. __But where those state laws conflict with ... legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede.__ In the present case, __the Board has applied its zoning regulations so as to prohibit a use of federal lands authorized by federal legislation. That action conflicts with the objectives and purposes of Congress reflected in the federal mining laws, and, as stated by the United States Supreme Court, "The State laws must recede."__*

14. In **Brubaker v. Board of County Com'rs, El Paso County, Colo.** (1982), the Supreme Court of Colorado (En Banc) ruled: *"(The) Statute providing for exploration of mineral deposits on federal land provided the explorer complies with applicable state law and statute providing for exclusive right of possession and enjoyment of the surface on compliance with state laws merely recognize a role for nonconforming state and local laws and __do not authorize state regulations that would bar the very activities authorized by mining laws.__ Mining and Minerals Policy Act of 1970, § 2, 30 U.S.C.A. § 21a; 30 U.S.C.A. §§ 22, 26; U.S.C.A. Const. Art. 6, cl. 2; Mineral Lands Leasing Act, §§ 1-25, 30 U.S.C.A. §§ 181-263."*

15. *"__A zoning authority may not apply its zoning ordinances so as to prohibit activity authorized under federal mining laws.__ Mining and Minerals Policy Act of 1970, § 2, 30 U.S.C.A. § 21a; 30 U.S.C.A. §§ 22, 26; U.S.C.A. Const. Art. 6, cl. 2; Mineral Lands Leasing Act, §§ 1-25, 30 U.S.C.A. §§ 181-263."*

16. They continue: *"__The underlying rationale of the preemption doctrine is that the Supremacy Clause invalidates state laws that "interfere with, or are contrary to, the laws of Congress."__ Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23, 73 (1824) "Except as otherwise provided, all valuable mineral deposits in lands belonging to the United States ... shall be free and open to exploration and purchase.... 30 U.S.C. § 22 (1976)."*

17. *"30 U.S.C. § 22 provides that "all valuable mineral deposits in lands belonging to the United States ... shall be free and open to exploration and purchase ...". Thus, if the*

*appellants' activities properly can be characterized as "exploration," those activities fall within the express scope of the federal statutes. Indeed, by denying the appellants the right to accomplish the desired core drilling and so to determine the validity of their claims, the Board is attempting to frustrate implementation of the very scheme of disposition of federal mineral lands that is at the core of 30 U.S.C. § 22."*

18. *"30 U.S.C. § 26 provides in pertinent part: The locators of all mining locations made on any mineral vein, lode, or ledge, situated on the public domain, their heirs and assigns, ... so long as they comply with the laws of the United States, and with State, territorial, and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth..."*

19. *"State and territorial legislation, therefore, must be entirely consistent with the Federal laws, otherwise it is of no effect. The right to supplement Federal legislation conceded to the State may not be arbitrarily exercised; nor has the State the privilege of imposing conditions so onerous as to be repugnant to the liberal spirit of the Congressional laws."*

20. Finally, in **Sharkey v. Candiani, 48 Oreg. 112,** the Oregon Supreme Court ruled that "*a state may prescribe additional or supplemental rules, but if these increase the burdens or diminish the benefits granted by the Federal Law, it is only because the Federal Government sanctions or acquiesces in the exercise of power*".

21. The Petitioners request that the Federal Government does not acquiesce in light of this attempt by the Respondents to tread upon Federal Law.

22. Meanwhile, SB 401 "Designates certain rivers and creeks as scenic waterways. Declares emergency, effective on passage." The intention of the bill is to ascribe a State Scenic Waterway designation to a large number of creeks and rivers. In particular, Respondent Alan Bates, has named fourteen (14) waterways inside the boundaries of the Galice Mining District that are well known as being important to local mining. The majority of affected mining claims held by miners in this mining district are found upon these streams, including: Grave Creek (53-57 claims affected), Briggs Creek (52-61 claims), Silver Creek (29-44 claims), Josephine Creek, which was the location of the first important gold

discovery in Oregon (58-83 claims), Rough and Ready Creek, which is the
location of many important nickel prospects (24-31 claims), East Fork Illinois
River (8-12 claims), West Fork Illinois River (6-11 claims), Illinois River (25
claims), Sucker Creek (64 claims), Rogue River (4 claims), Little Applegate River
(5 claims), South Umpqua River (6 claims), Cow Creek (33 claims), and the
Applegate River (9 claims). Note that these numbers do not include patented
mineral claims or mining interests located upon other types of private property.
Petitioner :kerby-dale: has mining interests on Grave Creek, Petitioner :ida-
lee: has interests in the Josephine Creek drainage and Petitioner :irvin-lee:.,
interests on Sucker Creek. Member-miners of the Galice Mining District have
mining interests on virtually all of the mentioned waterways. It is important to
note that these mining claims are located upon lands and waterways in which
the supreme title is currently held by the United States and which are open to
entry, location and mineral development under the 1872 Act.

23. To understand the impositions of SB 401, we must look to the relevant Oregon
Revised Statutes, as well as the administrative rules of the State of Oregon. SB
401 provides us with some insight of where to look in the statutes. The bill reads:
*SECTION 1. ORS 390.805 is amended to read: 390.805. As used in **ORS**
**390.805 to 390.925**, unless the context requires otherwise:*

> *(1)' **Related adjacent land' means all land within one-fourth of
> one mile of the bank** on the side of **Waldo Lake, or a river or
> segment of river within a scenic waterway**, except land that, in
> the State Parks and Recreation Department's judgment, does
> not affect the view from the waters within a scenic waterway.*

> *(2)'**Scenic easement' means the right to control the use of
> related adjacent land, including airspace above such land, for
> the purpose of protecting the scenic view from waters within a
> scenic waterway:** but such control does not affect, without the
> owner's consent, any regular use exercised prior to the
> acquisition of the easement, and the landowner retains the*

right to uses of the land not specifically restricted by the
easement.

24. **ORS 390.835** defines the "Highest and best use of waters within scenic waterways" and
contains provisions that particularly apply to mining. Section 14 of ORS 390.835 states that:
*"No placer mining shall be permitted on waters within scenic waterways other than*
*recreational placer mining."*

25. In turn, "recreational mining" is defined by **ORS 517.120(4)** and states that
*"Recreational mining' means mining in a manner that is consistent with a hobby or*
*casual use, including use on public lands set aside or withdrawn from mineral entry*
*for the purpose of recreational mining, or using pans, sluices, rocker boxes, other*
*nonmotorized equipment and dredges with motors of 16 horsepower or less and a*
*suction nozzle of four inches or less in diameter."*

26. It should be noted that the Mining Law of the United States does not recognize the term
"recreational miner" and that it was never the intention of Congress to open the Public
Domain for the purpose of "hobby mining" or "recreation".

27. As such, SB 401 will create yet another form of mining prohibition on the Public Domain,
including upon the appropriated mineral deposit claims of the miners. We have already
supplied ample evidence that the State of Oregon shall not prohibit or create
unreasonable regulations that infringe upon the rights of miners and their property.

28. The Petitioners charge that the Respondents are engaged in conspiracy to unlawfully
attempting to use the State Scenic Waterway Act as a means to circumvent and to
intentionally attack the rights of miners, as well as to extort the property of the miners or
to forever impose the will of the state upon the United States so far as the identified mineral
lands are concerned, utilizing the provisions outlined in **ORS 390.875** which is titled "Transfer
of Public Lands in Scenic Waterways to Department". This statute reads *"Any public land*
*within or adjacent to a scenic waterway, with the consent of the governing body having*
*jurisdiction thereof, may be transferred to the jurisdiction of the State Parks and*
*Recreation Department with or without compensation. Any land so transferred shall*
*become state recreational land and shall be administered as a part of the scenic waterway.*
*Any such land within a scenic waterway which is not transferred to the jurisdiction of*

*the department, to the fullest extent consistent with the purposes for which the land is held, shall be administered by the body having jurisdiction thereof in accordance with the provisions of ORS 390.805 (Definitions for ORS 390.805 to 390.925) to 390.925 (Enforcement). (1971 c.1 §8)."*

29. We must remind the court that there is nothing lawful about the state trying to impose its authority upon the United States, especially where disposal of its Public Domain enacted by Congress is concerned.

30. In fact, under its Admission Act, the State of Oregon agreed to certain conditions when it was admitted to The Union on February 14th, 1859. Included was the condition *"that said State shall never interfere with the primary disposal of the soil within the same by the United States, or with any regulations Congress may find necessary for securing the title in said soil to bona fide purchasers thereof".*

31. While the first Mining Law of the United States was not passed into law until seven years later on July 19th, 1866, the policy of the nation toward its Public Domain had been to dispose of the lands to bonafide purchasers under the varying Public Land Laws starting with the Harrison Land Act of April 15th, 1800. As the United States Public Land Commission explained it in their 1881 work "The Public Domain", *"All of this became national and public domain (referring to the Western lands secured by treaties and conquest), and the land laws of the United States were extended over it by Congress (for disposition and sale), excepting certain grants made therein by Spanish and Mexican authorities."* The Mining Act of 1866 and its subsequent notable revisions in 1870 and 1872 continued this policy of disposal and applied them to the mineral lands. While unique among the Public Land Laws of this nation, like the Harrison Act of 1800 and the better known Homestead Act of 1862, the Mining Law is a disposal of land subject to regulations which have been prescribed by Congress.

32. Further to the above, the same Admission Act, also imposed other conditions upon the State of Oregon, particularly in reference to waterways. Section 1 of the Act states *"That Oregon be, and she is hereby, received into the Union on an equal footing with the other States in all respects"* while Section 2 adds *"That the said State of Oregon shall have concurrent jurisdiction on the Columbia and all other rivers and waters bordering on the said State of Oregon, so far as the same shall form a common boundary*

Page **30** of **48**

*to said State, and any other State or States now or hereafter to be formed or bounded by the same; and said rivers and waters, and all the navigable waters of said State, shall be common highways and forever free, as well as to the inhabitants of said State as to all other citizens of the United States, without any tax, duty, impost, or toll therefor.*"

33. The courts of this country have long held (most recently by the Supreme Court in **PPL Montana v. Montana (132 S.Ct. 1215 (2012)**, that following in the tradition of English common law, that the States, in their capacity as sovereigns, hold title to the beds under navigable waters, provided that these waterways are maintained as Public Highways. The rule for state riverbed title assumed federal constitutional significance under the equal-footing doctrine. In 1842, the Courts declared that for the 13 original States, the people of each State, based on principles of sovereignty, "hold the absolute right to all their navigable waters and the soils under them," subject only to rights surrendered and powers granted by the Constitution to the Federal Government. In a series of 19th century cases, the Court determined that the same principle applied to States later admitted to the Union, because the States in the Union are coequal sovereigns under the Constitution. These precedents are the basis for the equal-footing doctrine, under which a State's title to these lands was "conferred not by Congress but by the Constitution itself." The title consequences of the equal-footing doctrine can be stated in summary form: Upon statehood, the State gains title within its borders to the beds of waters then navigable. It may allocate and govern those lands according to state law subject only to "the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce."

34. In **PPL Montana v. Montana (132 S. Ct. 1215 (2012)** court ruled that: ***"The United States retains any title vested in it before statehood to any land beneath waters not then navigable".***

35. It must be mentioned that many of the waterways being imposed upon by SB 401 are not navigable by any standards, nor have the respondents attempted to assert their navigability. The petitioners challenge the idea that the State of Oregon has any legitimate lawful authority to manage or claim ownership upon the Applegate River, Little Applegate River, Illinois River, Sucker Creek, Briggs Creek, Josephine Creek, Grave Creek, Silver Creek, Rough and Ready Creek, Cow Creek and many others mentioned in the bill. The petitioners charge that the legislation, where it attempts to impose the will of the State of Oregon upon the United

States over its Public Domain and upon the right of Congress to dispose of said Public
Domain under the Mining Law, constitutes a violation of the Oregon Admission Act, if not a
form of organized insurrection against the United States.

36. Meanwhile, the Rogue River has been at the center of several court cases to determine
navigability and ultimately state ownership of the river. In the most recent of these cases,
**Wilbur Hardy et al. v. Oregon State Land Board**, Jackson County, Oregon Circuit Judge
Ron Grensky ruled that the Rogue River was non-navigable from just above the City of
Grants Pass at River Mile 100 to its headwaters.

37. As Alan Bates has explained it to the media, one of his reasons for trying to impose his
legislation is his concern over mining taking place on the Rogue River near the vicinity
of the former Gold Ray Dam which is located at approximately River Mile 125. Each
summer, between a dozen to two dozen miners work this stretch of the Rogue River due to
its ease of public access. While the streambed is part of the federal estate, the surrounding
land ownership is a mixture of federal, county and private land. Although the federally
managed land and the streambed in this area is not open to location under the Mining
Law, the Bureau of Land Management is very much aware of the mining activity in the
area that has taken place for over three decades. To date, the United States has not imposed
any restrictions on metals mining along that portion of the river and it is generally known
locally that BLM consider mining in that stretch of the river as an acceptable activity,
even to the extent that a portion of it is publicized in a brochure published and made
freely available by the Medford, Oregon BLM office as one of three public mining areas
in the vicinity.

38. Though this portion of the Rogue River is not considered to be open to location under the
Mining Law and mining upon the river could theoretically be halted, it seems that the
authority to impose such a restriction lies with Congress and its appointee in the guise of
the Secretary of the Department of the Interior who are entrusted with that authority, not
the State of Oregon.

39. Again, the states themselves have no authority to prohibit or to create unreasonable
regulations in this regard.

40. Ultimately, in light of the circumstances and the Respondent's sheer defiance to Federal
Law and the will of Congress, the Petitioners believe that the Respondents have engaged in

criminal activity and we have no choice but to seek an emergency injunction to obtain federal intervention to adequately establish whether or not the legislation complies with federal law and whether or not the activities of the respondents have been lawful.

41. The Petitioners feel that if the court does not grant the requested relief and the bills are allowed to become ex post facto laws in violation of both Federal and State Law that the miners will not be the only ones who risk being irreparably harmed by this legislation.

42. If the bills pass, a hoard of civil actions against the State of Oregon filed by miners in the Galice Mining District, as well as elsewhere in Oregon, will be assured. It is our opinion that the State of Oregon would have very little chance of prevailing against such actions and would suffer severe financial consequences. Such claims might range from a few thousand dollars to millions of dollars each, depending upon the individual miner and his individual losses. Ultimately, it will be the people of this state who will have to foot the bill. The Petitioners have no desire to financially punish the already suffering people of this state just because they have elected a few individuals who seem to lack respect for the granted rights of miners.

43. Further to the above, we feel that it is inevitable that the agents of this state who will be entrusted with enforcing the provisions of these bills will also face irreparable harm if the Respondents are allowed to continue their current path. Whether lawful or not, employees of the Oregon Department of Fish and Game, the Oregon Department of State Lands and other state and local agencies, will be asked to enforce the ex post facto provisions of the legislation if allowed to become state law. Simply put, most of these employees will follow whatever orders their superiors give them for fear of being terminated.

44. The miners within this mining district, as well as those within other mining areas of this state, have been sending a very clear and uniform message to the Respondents, that message being that they understand that their rights are being unlawfully trampled and also that they will not surrender them without a fight. Ultimately, a large majority have made it clear that they will resist and are prepared to utilize every lawful means that is at their disposal to protect their livelihood, granted property and their federally protected rights.

45. There is not only a high probability that agents of the State of Oregon who are instructed to enforce the provisions of these bills will face serious civil liabilities for interfering with miners on the Public Domain of the United States, but in light of the unlawful nature of

the legislation, the same state employees could also face criminal charges.

46. *"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress..."* **(42 USC 1983).**

47. The Petitioners have already firmly established that so long as the miner complies with the provisions set down by Congress in the Mining Law, his or her mining rights upon the Public Domain, are considered to be a protected activity.

48. Federal Law levies stiff penalties upon those who knowingly violate the rights of others, even if they are operating under the Color of Authority and of Law.

49. **18 USC 245(b)(1)(B)** states that ***"Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with*** ... *(anyone)* ***participating in or enjoying any*** *benefit, service, privilege, program, facility, or* ***activity provided or administered by the United States;*** .... ***shall be fined under this title, or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under this title, or imprisoned not more than ten years"***.

50. Also, **18 USC 242** declares that any person who under color of law, willfully subjects another to a Deprivation of Rights *"shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years"*.

51. Similarly, **18 USC 241** states that: *"If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; ... They shall be fined under this title or imprisoned not more than ten years, or both"*.

52. While it may seem farfetched to some state employees that they might risk prosecution

under these or other federal laws, in June of 2012, in the climax to a nearly twenty year court battle, in **U.S. v. Estate of E. Wayne Hage and Wayne N. Hage**, Chief US District Judge Robert C. Jones found two federal employees guilty of contempt and referred them to the United States District Attorney to face civil and criminal charges arising from their attempts to willfully deprive the late E. Wayne Hage and his family of their grazing and water rights. Judge Jones also suggested that a conspiracy had taken place that might reach as far as the United States Department of Justice's office in Washington, D.C. Much of the Hage case involved the famous rancher's water ditch rights that derived from right-of-way provisions granted in the Mining Act of 1866.

53. Many miners have made it publicly clear that the filing of criminal complaints or in extreme circumstances, the use of the power of citizen's arrest, is not "off the table" in the defense of their rights. Consequently, the Petitioners believe that if their request for remedy is not granted, there is a high probability of harm to many parties.

## V. CONCLUSION / PRAYER

For the reasons set forth above, Galice Mining District specifically requests that the court do the following:

1. Issue a restraining order and an emergency preliminary injunction compelling the State of Oregon and its agents et. al. to adhere to Federal Law and the will of Congress.

2. Enter judgment for Plaintiff.

3. Award costs of court.

4. Grant any relief it deems appropriate.

Any communications by mail must be mailed to: Galice Mining District, [1525] Platt I, Sutherlin, oregon. [97479]. Any alterations or absence of bracketing or alteration in the lack of capitalization and the punctuation of the addressees will cause said mail to be returned and will be regarded as failure to communicate.

All rights reserved; none waived.

Sincerely,

3 karby-dale's [jackson]

: kerby - dale: [jackson]

Chief Executive Office – Galice Mining District

e-mail: kerbyjackson@mail.com

: delant-cory; [palmerton]

:delant - cory: [palmerton]

Vice Executive Officer- Galice Mining District

Private Attorney General

:ida-lee: [reman]

:ida - lee: [reman]

Recorder - Galice Mining District

e-mail: talktoida@gmail.com

:irvin-lee: [adkins]

:irvin - lee: [adkins]

Private Attorney General

## VI.    Proof of Service

Now comes the Plaintiffs, :ida-lee: [reman], :kerby- dale: [jackson], :delant – cory: [palmerton], :irvin- lee: [adkins], to place upon the clerk of courts for the "**district court of the United States"** district for Eugene this

**Complaint and Application for Injunctive Relief, Motion For Preliminary Injunction and Order Granting Preliminary Injunction** filing to be placed in a court of record on this 23[th] day, month of April in the year of our Lord 2013AD. Notice will be faxed to Respondents and a complete copy will be mailed to the Respondents listed below by means of the accompanying Certified Mail Numbers.

*:ida-lee: [reman]*

:ida - lee:
Recorder - Galice Mining District

Governor John Kitzhaber *et.al.*
    160 State Capitol
    Salem, Oregon 97301-4047
    CMN: 7010 1870 0003 5860 9881

Senator Peter Courtney et. *al.*
    900 Court St. NE S-201
    Salem, Oregon 97301
    CMN: 7010 1870 0003 5860 9874

Senator Jackie Dingfelder *et. al*        .
    900 Court St. NE S-407
    Salem, Oregon 97301
    CMN: 7010 1870 0003 5860 9850

Senator Alan Bates *et. al.*
    900 Court St. NE S-407
    Salem, Oregon 97301
    CMN: 7010 1870 0003 5860 9867

Attorney General Ellen F. Rosenblum
    1162 Court St. NE
    Salem, Oregon 97301-4096
    CMN: 7010 1870 0003 5860 9898