# VII. EXHIBITS

## EXHIBIT A

**The New War on Independent Mining in Oregon - LC 2125**
http://www.galicemining.com/mining-news/New-War-On-Mining-In-Oregon.html

On December 5th, 2012 the Oregon Senate Interim Committee on Environment and Natural Resources announced the agenda of their upcoming Work Session slated for December 11th, 2012.

Included on the committee's agenda is Legislative Concept 2125. The document, which is the forerunner of a potential Senate Bill, would declare an emergency prohibition of "placer mining using ANY form of motorized equipment or motorized dredge" in the State of Oregon and seeks to criminalize independent mining by imposing a "maximum of one year's imprisonment or $6250 in fines, or both". Despite masquerading as something aimed at only mining, the legislative concept also includes radical approaches to more firmly establish state control of water resources for not only livestock consumption, but also human use.

LC 2125 is strangely reminiscent of Oregon SB 765 which was sponsored by State Senators Atkinson, Bates and Hass in 2011. State Senator Jason Atkinson publicly declared a war on miners, particularly members of the New 49ers, with whom he seemed to have a particular axe to grind.

Miners, particularly those in SW Oregon and Northern California, promptly spearheaded opposition to Atkinson's bill. The opposition was so great that Atkinson promptly surrendered and killed his own bill in committee. Atkinson reportedly confessed that "the bill is not worth dying on the sword over", while his Policy Advisor, Kyle Vinyard, told the Gold Prospectors Association of America, that "the mining community — especially the mining community in southern Oregon — was so opposed to it, that we just decided we would withdraw it and leave it be."

Galice Mining District Executive Officer, Kerby Jackson, who helped to spearhead the fight against SB 765 in Oregon at the time, says that Vinyard downplayed the role of miners from elsewhere. "This was one of those rare occasions where miners everywhere stood together to fight a common enemy," Jackson recalled. "Even Canadian and Australian miners protested against what Atkinson was doing. Much credit is especially due to miners in California. Those guys knew what was at stake."

It is notable to mention that Vinyard also told GPAA that while SB 765 was dead, he also said that if Atkinson and other sponsors wished to revive the bill, they would wait until 2013 to do so.

Although a spokesperson for the Oregon Senate Interim Committee on Environment and Natural Resources could not be reached for comment to provide details on who the author of the Legislative Concept is, it seems likely that Vinyard was warning us about LC 2125.

If allowed to become a bill, Legislative Concept 2125 could have a destroying effect on independent mining in Oregon, particularly upon the Rogue River, as well as upon the use of water in the State of Oregon. In addition to attempting to criminalize mining and to bully Mineral Estate Grantees into purchasing permits that they do not necessarily need under

the 1872 Mining Act, the language of the draft indicates that the State of Oregon intends to so heavily regulate mining in Oregon that it will destroy the rights of miners. You can read the draft here.

Jackson, who says that he intends to call an emergency meeting of the Executive Committee of the Galice Mining District regarding the issue, says that he is particularly alarmed by the use of language in the draft, which he says is deceptive and often misleading.

"There seems to be a recurring theme in this draft that suggests that miners who are not self-described 'recreational miners', as defined in ORS 517.120, are going to be imprisoned and fined if they are using any type of mechanical equipment, including a suction machine, on their claim without having a Notice of Intent or Plan of Operation that has been approved by BLM or USFS in place. As many miners are certainly aware, here in Oregon, many Mineral Estate Grantees have openly rebelled against the idea that an NOI or a Plan of Operation is required for them to mine upon their property. There is a long brewing debate between miners and the agencies on this issue. The position of the agencies is that the Surface Resources Act and also the FLPMA requires that they impose Plan of Operations in certain circumstances, while the position of many miners is that mineral deposits located under the 1872 Mining Act had specific exemptions from those requirements. Regardless of what side of that debate you are on, the State of Oregon lacks lawful authority to make any demands on Mineral Estate Grantees in that regard. Much the same way, the basic policy of the agencies has been that certain types of mechanical mining equipment do not require a Notice of Intent or a Plan of Operation and the State of Oregon has no lawful authority to impose its will on the agencies any more than it does upon the miners. In addition, the draft absolutely forbids the use of mechanized equipment on unappropriated lands managed by the United States. Ultimately, this means that the State of Oregon is attempting to restrict the prospecting methods of a miner attempting to make a legitimate discovery on unappropriated lands to the limitations of a gold pan. Much the same way, it attempts to restrict those miners who choose not to make a location from doing anything more than prospecting with a pan. That constitutes a prohibition and is an outrage against the 1872 Mining Act, which the states have no authority to meddle with. Basically, the draft violates federal law as the legislature of this state is expressly forbidden from interfering with the will of Congress."

"Another problem with this draft," Jackson adds, "is the wishy-washy language of the definitions outlined in ORS 517.120 which it references. None of these definitions accurately correspond with the language in the Mining Law, which leads us to wonder if any of the so-called exemptions apply to the granted mineral property of most miners. At the very least, even if there is not an intent to target the rights of miners, the mis-use of language is going to result in abuses by the State of Oregon. Another very alarming problem lies in the fact that the draft does not enumerate upon mining activity on patented property. This suggests that anyone mining on a patented claim with more than a hand sluice or a gold pan will be subject to imprisonment and, or fines. All in all, what we are seeing is that there are public servants inside the State of Oregon who are pushing to totally destroy the right to mine. This is a very serious issue developing."

Jackson also points out that the draft places strict limitations on when and where miners may mine on rivers, creating a prohibition on mining within 500 feet of any residence, campground or area designated for swimming.

Tacked onto the draft is also far reaching restriction on the appropriation of water. "Not only will this adversely effect miners, but also ranchers, farmers and everyday people," Jackson noted. "There are restrictions in this draft that could put a rancher out of business because it will limit the amount of water that he can appropriate for his livestock if his ranch gets water from a particular waterway and even if he has a pre-existing water right, the draft can call to limit the amount of water he can appropriate. Much as it does to mining, there is nothing in the draft to forbid the State of Oregon from creating a takings apart from offering the typical red tape of administrative appeals." "Basically, all this draft is, is a continuation of what has been taking place in California," Jackson noted. "If we can't stop it in Oregon, it will spread into other states. As we did with Atkinson's legislation, what we need is for miners everywhere to pull together and give the anti-mining, anti-property crowd another beating to remember".
WHAT YOU CAN DO:
Miners and others who are concerned about this alarming legislative concept and attacks on property rights are encouraged to voice their opposition to LC 2125. In addition to spreading the word about this dangerous legislative draft to others, we request that you make your feelings known about LC 2125 to the Oregon Senate Interim Committee on Environment and Natural Resources BEFORE December 11th, 2012.
If you use Facebook, please share this page with your friends:
To make your voice heard, please contact the following Senate Committee Members: (note: we recommend not only sending them e-mail, but also calling them).
Senator Jackie Dingfelder
D-Portland
District 23
Phone: 503-986-1723
E-mail: sen.jackiedingfelder@state.or.us

Senator Alan Olsen
R-Canby
District 20
Phone: 503-986-1720
E-mail: sen.alanolsen@state.or.us
Senator Mark Hass
D-District 14
Phone: 503-986-1714
E-mail: sen.markhass@state.or.us

Senator Floyd Prozanski
D-South Lane and North Douglas
Counties District 4
Phone: 541-342-2447
E-mail: sen.floydprozanski@state.or.us

Senator Chuck Thomsen
R-Hood River
District 26
Phone: 503-986-1726
E-mail: sen.chuckthomsun@state.or.us

# EXHIBIT B

---- Original Message ---
From: Kerby Jackson
Sent:12/06/12 06:25AM
To: kristi.hauck@state.or.us
Subject: LC 2125
Ms. Kristi Hauck
Committee Assistant - Oregon Senate Environment and Natural Resources Committee
December 6th, 2012

Dear Ms. Hauck,
On December 11th, 2012, the Senate Environment and Natural Resources Committee, of which you are an assistant to, is apparently reviewing a Legislative Concept known as LC 2125 that pertains to Placer Mining in the State of Oregon.
As the Chief Executive Officer of the Galice Mining District, a local miner's government (reference 30 USC 28), let me just say that I have received had some rather alarming emails related to this particular legislative concept that the committee intends to review. Since the mining community in Oregon has been blind-sided by the appearance of LC 2125, I would appreciate if you can submit to me, more information on this draft. In particular, I would like to know who the author of this draft is and if this draft has been reviewed by the State Attorney General and the United States Attorney General.
Even at this early stage, it is the opinion of many within the mining community that this legislative concept attacks the granted rights of locatable mineral miners and is in violation of the public grant contained in the 1872 Mining Act, as well as exceeds the legislative limitations imposed by the United States Congress within the Admission Act of the State of Oregon. In addition, we believe that this legislative concept over-steps the lawful authority of the State of Oregon, attempts to usurp the vested jurisdiction and authority of the organized and unorganized mining districts within the lines of this state that was granted to Locatable Mineral Estate Grantees by the United States Congress, as well as creates a high probability of inverse condemnation by the State of Oregon, thereby exposing the people of this state to potential liabilities, and ultimately, will do much to aggravate an already strained relationship between the State of Oregon and Locatable Mineral Estate Grantees.
In addition, I am requesting insight into how the mining community, its related organizations and our organized mining districts may best communicate with the Committee regarding this issue.
Cordially,
Kerby Jackson
Chief Executive Officer: Galice Mining
District www.galicemining.com


cc: Recorder: Galice Mining District

# EXHIBIT C

----- Original Message -----

From: Patrino Beth
Sent: 12/18/12 08:33 AM
To: kerbyjackson@mail.com

Subject: LC 2125

Mr. Jackson,

You recently emailed Kristi Hauck concerning LC 2125. The Senate Environment and Natural Resources Committee did vote last week to introduce this LC to the 2013 Legislative Session. No further review or action was taken. The 2013 Legislative Assembly will convene in early February and at that time, this LC will become a bill and go through the same process as any bill. First, the Chair of the committee to which the bill is referred must decide whether to hear the bill. If they decide to hear it, a public hearing will be noticed. After a hearing, or series of hearings, the Chair will decide whether to take any action on the bill. If they decide to work further on the legislation, a work session will be noticed. If a bill is voted affirmatively in the first chamber, it then goes through a similar process in the opposite chamber.
As you can see, there are many steps ahead for any introduced bill. The types of reviews your email identified – the Attorney General's Office, etc. – have not yet taken place. You may want to sign up to receive committee meeting notices via the Legislature's website. You can sign up for "E-subscribe" from that site: http://www.leg.state.or.us/ I would suggest signing up to receive email notices of hearings and work sessions of the Senate Environment and Natural Resources Committee and the House Energy, Environment and Water Committee. This way, you will be emailed notices of all committee hearings and work sessions.

I hope this information is helpful,

Beth Patrino


Beth Patrino, Committee Administrator

Senate Committee on Environment and Natural Resources
House Committee on Energy, Environment and Water
Legislative Committee Services
347 State Capitol, Salem, OR 97310
503.986.1751 (direct line)
503.559.2187 (cell)

# EXHIBIT D
# Alan Bates Launches New Attack on Mining Property and Water Rights

## SB 370: Oregon Senator Alan Bates Launches New Attack on Oregon Mining

Were it not enough that miners in Oregon were not already under attack by SB 117 (previously known as LC 2125), in a surprise attack, Oregon State Senator, Alan Bates (D-Ashland) recently submitted his own attack on Oregon placer mining with the introduction of his own bill, SB 370.

Bates, it will be remembered, was a co-sponsor of former State Senator Jason Atkinson's attack on mining in Oregon back in 2011, which drew so much ire from miners throughout the country that he promptly killed his bill, SB 765, stating that the bill was "*not worth falling on the sword for*" after he publicly "declared war" on miners. Apparently, Senator Alan Bates did not learn much from Jason Atkinson, who recently retired *from the political arena after being successfully challenged for his seat by local farmer and* forestry worker, Herman Baertschiger Jr.

The new bill, SB 370, which Bates has not yet listed on his own website, seeks to impose greater requirements for miners to obtain permits for so-called "commercial mining" which is not actually even defined in the bill's language but seems to indicate that it **may** include motorized mining utilizing a suction nozzle with an inside diameter of less than four inches, sets a fee of $125 for the permit (DSL being given 100% liberty to write said permit) and threatens non-compliance with imprisonment and heavy fines. You can read the bill here.

Galice Mining District Chief Executive Officer, Kerby Jackson, said that the bill is just another recent example of the State of Oregon's attempts to unlawfully over-step their authority over the 1872 Mining Act.

"*The lawful authority of the Oregon Department of State Lands extends only over lands that the State of Oregon owns or manages,*" Jackson explained. "*As a division of the Oregon State Land Board, originally, this authority was limited by the Oregon Admission Act of 1859 to the State School Lands and the beds of navigable waterways that were used as common public highways. The intent of Congress was for the state to utilize the mineral, timber and other resources of those lands for the benefit of the state. Originally, the*

*State Land Board oversaw about 6% of the lands in the state. Later on, the state chose to sell much of that land off. Today their authority extends only over about two million acres of land in this state, which includes the remaining school lands, state parks, state forests and lands owned by varying state agencies. That's less than one percent of the entire state. However, the Land Board and DSL's authority do not extend over non-navigable waterways, public lands and public domain managed by the federal government or privately owned land. In particular, the state lacks authority on lands which have been appropriated from the Public Domain of the United States. What I'm saying in a nutshell, is that DSL and other Oregon state agencies do not have lawful authority on a locatable mineral deposit and their right to regulate does not extend upon land which they do not manage.*"

SB 370, Jackson notes, creates a blanket regulation over placer mining anywhere inside the State of Oregon, stating in part:

"*a person may not practice commercial placer mining in this state (emphasis added) unless the person acquires a commercial placer mining permit from the Department of State Lands*".

The bill goes on to state:

"*(2) Commercial placer mining taking place under a permit issued under this section:*
*(a) May not use a suction nozzle with an inside diameter greater than four inches;*
*(b) Must occur upstream of all activities specified in rules adopted by the Director of the Department of State Lands;*
*(c) Must conform to rules adopted by the director regarding the safe placement of gasoline cans; and*
*(d) Must conform to any other rules adopted by the director under this section.*"

The language seems to indicate that any mining that utilizes a suction nozzle with an inside diamater of less than four inches is to be classified as "commercial mining". If this is the case, it remains clear that

Alan Bates doesn't know much about mining, since machines of this small size are only rarely used by those who describe themselves as "commercial miners".

The bill also imposes a permit fee of $125 and then imposes stiff penalties for non-compliance, which include 30 days imprisonment and a fine of $1250.

"*Let's call it what it really is,*" Jackson said. "*It's nothing more than an attempt to try to create compliance on the part of the miners to obtain an illegal permit from an agency with no authority through the use of inciting fear of loss of freedom or property. We already know that Bates is anti-mining. Isn't that a type of terrorism, when you try fo further a political agenda using the threat of imprisonment through illegal regulation?*"

In fact, the Code of Federal Regulations (28 C.F.R. Section 0.85) actually defines terrorism as *"the unlawful use of force and violence against persons or property to intimidate or coerce a government, the civilian population, or any segment thereof, in furtherance of political or social objectives"*.

*"Let's be clear about something,"* Jackson added. "*This legislation is completely inconsistent with the 1872 Mining Act and is going to create a serious liability problem for the State of Oregon, not too mention its employees who are expected to enforce the so-called law if the bill is adopted. The fact is, many miners are going to refuse to comply for the simple fact that they know what their rights are. They understand that they have property rights and a right to benefit from their property. Any agent of the State of Oregon who goes on the mineral property of those miners and who makes an attempt to arrest that miner simply for the crime of excercising his rights is going to find themselves open to not only civil action, but also likely criminal prosecution.*"

# EXHIBIT E

## Report Alan Bates and the State of Oregon for attempting to violate your Mining Rights

The 1872 Mining Act amended a current and existing grant given to the people of the United States by the Act of Congress of July 16th, 1866.

In Belk v. Meagher, the Supreme Court says of the Mining Act of 1866:

*"(T)he locator of a mining claim has a possessory title thereto, and **the right** to the exclusive possession thereof. The words imply property. **The right to the exclusive possession and enjoyment of a mining claim includes the right to work it, to extract the mineral therefrom, to the exclusive property in such mineral, and the right to defend such possession**. **The right to the exclusive possession and enjoyment of property**, accompanied **with the right to acquire the absolute title** thereto, presupposes a grant, and the instrument of this grant, as applied to mining claims upon the public lands, is the act of congress above referred to. This act being of general application to all the mineral lands belonging to the government, and conferring a title or easement therein upon the locator thereof, and **vesting the right in him** to become the absolute owner to the exclusion of all others, is a legislative grant, and being given by act of congress, is equivalent to a patent from the United States to the same."*

In the landmark case, Fletcher v. Peck, the Supreme Court ruled that public grants (such as those within the Mining Law) are considered to be contractual obligations that cannot be abrogated, even to the point that "*a repeal of the law cannot devest those rights"* because they are considered to be protected by several provisions in the United States Constitution.

In particular, the court ruled that: "***The State legislatures can pass no ex post facto law**. An ex post facto law is one which renders an act punishable in a manner in which it was not punishable when it was committed. Such a law may inflict penalties upon the person, or may inflict pecuniary penalties which*

*swell the public treasury. The legislature is then prohibited from passing a law by which a man's estate, or any part of it, shall be seized for a crime which was not declared by some previous law to render him liable for punishment."*

The Constitution of the State of Oregon also reaffirms the findings in Fletcher v. Peck, Section 21 of the document, declaring that: "***No ex-post facto law, or law impairing the obligation of contracts shall ever be passed***".

Miners have a constitutionally protected right to go upon the Public Domain of the United States to search for locatable minerals, as well as the right to appropriate them for their exclusive possession and for their exclusive finiancial benefit. The rights of miners that were granted to them by Congress also include the right to extract the locatable minerals which were granted to them. Not even Congress has the authority to prohibit the Mineral Estate Grantee from his/her appropriated locatable mineral deposit. To do so, would violate the miner's constitutional rights.

In the famous Shumway case, the 9th Circuit Court of Appeals ruled that: *"The owner of a mining or mill site claim does not need a patent, or a vested right to issuance of a patent, to possess and use the property for legitimate mining or milling purposes. **A mining or mill site claim is "property in the fullest sense of the word."***"

Much to this end, the same court, in Swanson v. Babbit, ruled: ***"mining claims are `private property' which enjoy the full protection of the Fifth Amendment***."

Oregon Senator Alan Bates wants to do to every miner in the land, exactly what is expressly forbidden by the United States Constitution, the Oregon State Constitution and other guiding laws of the land by stripping Mineral Estate Grantees of their right to conduct placer mining on their mineral deposit except under certain exemptions and altogether banning placer mining within 1/4 of a mile of dozens of gold bearing waterways, including upon mining claims all in the name of public use.

Senator Bates recently introduced Senate Bills 370 and 410 to the Oregon Legislature with the intention of doing exactly that. Bates is also believed to be the author of SB 115 (which in violation of the Rules of the Oregon Senate, does not bear the name of its sponsor). We encourage miners to read these bills.

The legislation, taken altogether, is so severe that it will not only make criminals of miners who are engaging in their Congressionally granted rights to placer mine, but also strip them, in some circumstances, of the exclusive possession and enjoyment of their granted mineral properties for public purposes.

This is despite the fact that the Constitution of the State of Oregon (Section 18) states in part, that: *"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered"*. This merely reaffirms the 5th Amendment.

Federal law, which is embodied in the United States Code, doles out severe punishments to those public officials who intentionally violate the Constitutionally protected rights of all.

For example, under 18 USC 242, it is a felony for a public official to deprive someone of their rights under a color of law or authority. The law reads in part that: "***Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States***, *or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are*

prescribed for the punishment of citizens, **shall be fined under this title or imprisoned not more than one year, or both**".

Meanwhile, 18 USC 241, imposes even greater punishments on those who are involved in conspiracies to deprive others of rights. The law states: "*If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same ... They shall be fined under this title or imprisoned not more than ten years, or both.*"

Similiarly, 18 USC 245, carries equal punishments for those who willfilly attempt to interfere with any activity that is administrated by, and protected by, the United States government. The granted right to mine upon the Public Domain, deriving from several Acts of Congress, is one administrated exclusively under the authority of the United States government.

Speaking on the official mineral policy of the United States, U.S. District Paul Rosenblatt explained: "*Because mining has been accorded a special place in the national laws related to public land, the development of mineral resources in the national forests may not be prohibited or unreasonably circumscribed.*"

While Senator Bates and his ilk are certainly free to have their opinions in the current debate about the environmental effects of placer mining and they may even work to find ways that limit potentially adverse environmental effects created by modern placer mining (if any), it is the opinion of the miners within the Galice Mining District, that Senator Bates is attempting to use his position as a public servant to deprive Mineral Estate Grantees of their rights and property and that his legislative activity is unlawful. With that in mind, we encourage other miners to contact the Federal Bureau of Investigation in Portland, Oregon, as well as the Civil Rights Division of the United States Department of Justice in Washington, D.C. if they feel their civil rights are being violated, as well as to contact Congress.

If you feel that your rights are unlawfully being violated by this proposed legislation, please contact:

Portland Field Office: Federal Bureau of Investigations
9109 NE Cascades Parkway
Portland, OR 97220
Phone: (503) 224-4181
Fax: (503) 460-8088
E-mail: portland@ic.fbi.gov

US Department of Justice
950 Pennsylvania Avenue, NW
Civil Rights Division
Criminal Section – PHB
Washington, DC 20530
(202) 514-3204

We also encourage you to contact the United States Congress, who was responsible for granting you your right to mine and who are in effect, entrusted with seeing that your rights are protected. Please use the link below to contact the Natural Resources Committee who oversee locatable minerals and inform them that there are attempts being made in Oregon by Senator Bates to destroy your right to mine under the 1872 Act, as well as to usurp Congressional authority to dispose of and utilize the Mineral Lands of the Public Domain.

https://naturalresources.house.gov/contact/

You can also give the committee a call at: (202) 225-2761

## EXHIBIT F
### (Attached Separately)
### WMA Letter to A. Bates

## EXHIBIT G
### (Attached Separately)
### Mark Johnson Email to Bates/: kerby-dale: challenge Request for transparency Jan 21 2013

## EXHIBIT H
### (Attached Separately)
### :kerby-dale: Notice to Dingfelder and Courtney Jan 22/13

## EXHIBIT I
### (Attached Separately)
### :kerby–dale:/ GMD Public Records Request for digital copies Jan 25, 2013

## EXHIBIT J
### (Attached Separately)
### Feb 4th reply from Dexter Johnson reg request to Courtney's office

EXHIBIT K
(Attached Separately)
:kerby-dale:/Emily Brandes/Kevin Hayden Exchange Reg.
PRR 260 pkg.


EXHIBIT L
(Attached Separately)
GMD Notice of Violations and Intent to Pursue



**WESTERN MINING**
A L L I A N C E

| | | | |
|---|---|---|---|
| Public Lands for the People<br>20929 Ventura Blvd<br>Suite 47-466<br>Woodland Hills, CA 91364 | New 49ers<br>27 Davis Road<br>Happy Camp, CA 96039 | Willamette Valley Miners Association<br>PO Box 13044<br>Salem, Oregon 97309 | Millenium Diggers<br>33180 Dorset Ln<br>Philomath, OR 97370 |
| Waldo Mining District<br>PO Box 1574<br>Cave Junction, OR 97523 | Galice Mining District<br>1525 Plat I<br>Sutherlin, OR 97479 | NorthWest Mineral Prospectors<br>PO Box 1973<br>Vancouver, WA 98668 | Douglas County Prospectors Assoc<br>444 NE Winchester PMB 12D<br>Roseburg, OR 97470-3256 |

18 January 2013



Senator Alan Bates
900 Court St NE
S-205
Salem, OR 97301

Dear Senator Bates,

We are aware of recent efforts by the Oregon Senate to consider recently introduced legislation, Senate Bill 115 (SB115) that would restrict and prohibit placer mining for gold in Oregon.

We are concerned that the Oregon legislature is acting based on misinformation provided by special interest groups and actions taken by the legislature may result in significant legal implications. The organizations listed in the header of this letter represent thousands of potentially affected miners, the majority of these organizations are also current litigants in mining related cases.

Special interest groups have claimed the Oregon legislature must take action to restrict suction dredge mining in Oregon based on the findings from the 2011 California Subsequent Environmental Impact Report (SEIR) this SEIR is currently the subject of three separate lawsuits and we expect the SEIR to be invalidated.

Federal law is clear; the States may not prohibit mining. While SB115 specifically targets the use of suction gold dredges, a type of mining equipment, it is prohibitory in nature and is not based in fact, science or the truth. This activity has been studied extensively for over forty years in peer reviewed research, articles, journals and by the US EPA, the State of Washington, the State of California and the State of Idaho. There are over forty separate research reports in regards to the effects of suction dredging on fish and the environment. All credible reports, including the US EPA conclude that suction dredging has only a localized and temporary effect on the environment.

PO Box 33218 • Reno, NV 89532 • www.westernminingalliance.org • info@theminingalliance.com

EXHIBIT "C"

Miners and prospectors have a statutory right, not a mere privilege, to go upon the Public Domain of the United States for mineral prospecting, exploration and development. The States may not unreasonably restrict or prohibit either temporarily or permanently the exercise of that right. (30 U.S.C. § 22 et seq; 30 U.S.C. § 21a; 16 U.S.C. § 481; 43 U.S.C. § 661; 43 U.S.C. § 1701; 30 U.S.C. § 612(b), 613, 615). The Mining Law of the United States remains the 1872 Federal Mining Law (30 U.S.C. § 22) which states in part "[miners may operate on Federal lands] under regulations prescribed by law, and according to local customs of rules of miners in the several mining districts, *so far as the same are applicable and not inconsistent with the laws of the United States."* Congressional intent and case law are clear on this point – the States may not prohibit what Congress has authorized. Regulations must be reasonable and not prohibitory (see Brubaker v. El Paso County, 652 P.2d 1050 (Colo 1982)). Further as you are aware State legislation must be entirely consistent with Federal legislation "The right to supplement Federal legislation, conceded to the state, may not be arbitrarily exercised; nor has the state the privilege of imposing conditions so onerous as to be repugnant to the liberal spirit of the congressional laws." (see Butte County Water Co. v. Baker, 196 U.S. 199, 125, 49 L.Ed, 412, 25 S.Ct. 211 (1905)).

Consistent with U.S. Supreme Court rulings, the considered legislation would be contrary to published opinions, see California Coastal Commission v. Granite Rock Co., (480 U.S. 572 (107 S.Ct. 1419, 94 L.Ed.2d 577)), the U.S. Supreme Court wrote "Land use planning in essence chooses particular uses for the land; environmental regulation, at its core, does not mandate particular uses of the land, but requires only that, however the land is used, damage to the environment is kept within prescribed limits."

The legislation being considered in Oregon is prohibitory. It prohibits the use of a specific type of mining equipment; it does not regulate the environmental effects and in fact does not even address environmental effects. It merely prohibits motorized methods of recovering placer deposits.

The truth about the environmental effects of placer mining is far different than the scare tactics being used by special interest groups and we have attached a summary of relevant peer reviewed research. No emergency situation exists and we refer you to Hillman v. California Department of Fish and Game (A226402, California 1st District Court of Appeal, 28 December 2011) in which the Appeals Court overturned the emergency injunction.

We recommend you await the results of the seven legal cases in California prior to considering legislation that leads to more litigation against the State of Oregon. The potential for litigation over this action is virtually assured. We will be happy to provide fact based expert testimony at your convenience to inform the legislature of the methods of operation and the environmental effects, as determined by science, of suction dredge mining for gold.

Respectfully,

ERIC MAKSYMYK
The Western Mining Alliance

# The Suction Gold Dredge

A suction gold dredge is a type of mining equipment. It is used to recover valuable gold deposits from the bottom of streams and rivers. The United States Environmental Protection Agency has consistently found these small devices cause only temporary and localized disturbances to the environment and the EPA has consistently issued permits for this type of mining.

Suction dredging for placer gold is one of the most efficient methods of gold mining in existence. As opposed to other



forms of mining a very small amount of material is used relative to the amount of gold recovered. For comparison, hydraulic mining averaged 47 cents per 16 cubic yards moved (see Hammond, 1889); modern mining such as shown on the Discovery program "Gold Rush" averages $1.65 per cubic yard moved (from information provided on the show). A suction gold dredge, based on information from suction dredger surveys averages $55 per cubic yard moved. It is this amazing efficiency which drives the popularity of this type of mining. It is highly efficient, requires a relatively small investment, and yet provides a high economic return moving very small amounts of material.

Some perspective is required when thinking about suction gold dredges. The average power of the typical gold dredge used in Oregon is between 5-8 hp. The dredge shown in the picture uses a 6.5hp engine. The average material moved per day is approximately three cubic yards (source is California Department of Fish and Game, Suction Dredge Survey, 2011). The impact of these small devices when taken individually and collectively is of insignificant effect relative to the forces of nature. All studies conclude that the effects from suction dredges are



erased after the next flood, which in California occurs approximately every 1.5 years.

On the left is the South Yuba River, in California, at flood stage. The dredge shown above is running at full power and provides some perspective on the effects of a suction dredge. No quantity of suction dredges could equal the destructive force of a single natural flood event. Claims that suction dredging harms the environment ignore science based effects and research.

# Summary of Key Findings of the California SEIR

The below table is a summary of findings from the California Supplemental Environmental Report completed in 2011  After two years of study the following represents those areas that were found to have a less than significant effect on the environment.

| Effect | 1994 EIR | 2011 EIR |
|---|---|---|
| Entrainment on adult fish | LTS | LTS |
| Entrainment on juvenile fish | LTS | LTS |
| Entrainment on eggs | LTS | LTS |
| Other impacts on fish | LTS | |
| Effects on spawning | LTS | LTS |
| Early Life Stage effects on fish | N/A | LTS |
| Behavioral effects on juvenile and adult fish | N/A | LTS |
| Effects on movement and migration | N/A | LTS |
| Effects on benthic invertebrates (prey base) | LTS | LTS |
| Creation or alteration of pools or other thermal refuge | N/A | LTS |
| Destabilization or removal of instream habitat | N/A | LTS |
| Impacts on stream and riparian habitat | LTS | LTS |
| Impact to river substrates | LTS | LTS |
| Impact to river banks | LTS | LTS |
| Impact to riparian habitats | LTS | LTS |
| Effects on special status invertebrates | N/A | LTS |
| Effects on special status raptors | N/A | LTS |
| Effects on special status non-listed terrestrial animals | N/A | LTS |
| Effects on special status wetland and aquatic plants | N/A | LTS |
| Effects on special status upland plants and habitats | N/A | LTS |
| Effects on wetlands | N/A | LTS |
| Changes to ecosystems or reduction in biodiversity | N/A | LTS |
| Direct disturbance to riparian or aquatic habitats | N/A | LTS |
| Introduction or dispersal or invasive species | N/A | LTS |

| | | |
|---|---|---|
| Effects of encampments | LTS | LTS |
| Impacts to water quality | LTS | LTS |
| Accidental releases of oil or gas | LTS | LTS |
| Effects of releases of toxic chemicals | LTS | LTS |
| Turbidity | LTS | LTS |
| Exposure to mercury or acid vapor | LTS | LTS |
| Lead | LTS | LTS |
| Effects on release of trace organic compounds | N/A | LTS |
| Other recreational opportunities | LTS | LTS |
| Air pollution | LTS | LTS |
| Garbage and sanitation (water quality) | LTS | LTS |
| Impact of Oil, gas discharges | LTS | LTS |
| Disturbance of human remains | N/A | LTS |
| Aesthetics | LTS | LTS |
| Temporary increase in noise above ambient | N/A | LTS |
| Cumulative effects of dredging on fish | LTS | LTS |
| Cumulative effects on special status plants | N/A | LTS |
| Cumulative effects on greenhouse gas emissions | N/A | LTS |
| Cumulative effects from resuspension of other trace metals | N/A | LTS |
| Cumulative impacts above ambient noise levels | N/A | LTS |
| Cumulative impacts on recreational opportunities | N/A | LTS |



# Summary of Significant Research

Contrary to what special interest groups would lead you to believe, the subject of suction dredging, and the related environmental impacts have been well researched. There is considerable, peer reviewed research and findings available. The research findings presented below are either drawn from the actual environmental impact reports, or are from research used within the EIR. The preponderance of research indicates the effects from suction gold dredging are both temporary and localized.

1. "But based on the best available data specific safeguards included in the proposed project the project would not be deleterious to fish and would be minimized to less than significant." Finding of California 1994 EIR on suction dredging. State of California, 1994 Environmental Impact Report, page 47.

2. "Suction dredging appears to have little direct immediate effect on adult fish in terms of harm from actual entrainment in dredges." "Suction dredging does not appear to have any effects on the entrainment of juvenile fish either." State of California, 1994 Environmental Impact Report, page 49.

3. "While adult fish did not show a sensitivity to entrainment it is unlikely that they would be sucked into a dredge in the first place. They have the ability to avoid entrainment in a suction dredge by moving to a safer location. All of the investigators who examined the impacts of suction dredges on adult fish concluded that this life stage was not acutely affected (Harvey 1986, Hassler et al. 1986, Summer and Hassler 1992). Harvey (1986) found this to be the case for rainbow trout on streams he studied in California."

4. "Most of the effects related to turbidity and sedimentation, and disturbance to spawning gravels reported, were temporary and localized, and therefore, represented impacts considered less than significant under regulated conditions." State of California, 1994 Environmental Impact Report, page 50.

5. "Suction dredges' unique method of intake and displacement present unusual permitting issues. They operate on the surface of the water, only remove material from the bottom of the waterbody, and process and quickly return mined material to the bottom. For these reasons EPA has determined that numeric effluent limitations are not practical. Instead, the BMPs (Best Management Practices) in Permit Part II have been developed. These BMPs, which are supplemented by required turbidity monitoring designed to ensure that the BMPs are being implemented properly, are, in this circumstance, sufficient to implement the requirements of [the Clean Water Act]." US EPA, 2006, Fact Sheet for permitting of a 10" dredge on the Fortymile River in Alaska.

6. "Information provided in EPA's suction dredge study and the United States Geological Survey (USGS) study on an eight and a ten inch suction dredge support the conclusion that the potential effects on water quality are short-term." US EPA, 2006, Fact Sheet for permitting of a 10" dredge on the Fortymile River in Alaska.

7. Within approximately 45 days the repopulation of benthic invertebrates is at pre-dredging levels. Harvey, 1986.

8. Mortalities of benthic invertebrates less than 1% after passing through a suction dredge. Griffith and Andrews, 1981.

9.  "Due to the short term and localized effects of suction dredging the effects on benthic invertebrate communities the effects can be considered less than significant." State of California, 1994 Environmental Impact Report, page 58.

10. "In general, our results are in agreement with other studies that have found only localized reductions in macroinvertebrate abundance in relation to small scale dredging." Reference is to a 8" dredge in Alaska. Prussian, 1997, US EPA.

11. "Dredge tailings are often referred to as good salmonid spawning substrate. In the Trinity River, chinook salmon have been observed spawning in the tailing piles of suction dredges ( E. Miller pers. comm. ). Steelhead in Idaho streams have been reported to spawn in gravels recently disturbed by human activities ( Orcutt et al. 1968 ). In the American River Prokopovich and Nitzberg ( 1982 ) have shown salmon spawning gravels have mostly originated from old placer mining operations." Hassler, et al, 1986.

12. "Suction dredge mining did not appear to influence the locations of adult anadramous salmonid summer-holding areas. One spring-run chinook salmon was observed 50m below an operating dredge and a summer-run steelhead was seen at the upper end of a 30m long pool while a dredge was operating at the lower end. Seven other adult salmonids were observed within 250 m of an active dredge operation and none appeared to be disturbed by mining activities. Stern 1988

13. 91% of evidence of summer suction dredging was removed by that years winter flows. Stern, 1988.

14. Winter and spring flows eliminated virtually all evidence of summer dredging. Hassler, et al, 1986.

15. Dredger holes and tailings eliminated after winter flows. Thomas, 1985.

16. Suspended sediment levels return to normal within 100 feet of the dredge site. Thomas, 1985.

17. Turbidity below a 2.5" dredge on two Idaho streams was nearly undetectable. Griffith and Andrews, 1981.

18. "Effects from elevated levels of turbidity and suspended sediment normally associated with suction dredging as regulated in the past in California appear to be less than significant with regards to impacts to fish and other river resources because of the level of turbidity created and the short distance downstream of a suction dredge where turbidity levels return to normal." State of California, 1994 Environmental Impact Report, page 63.

19. "The proposed project [dredging] would not result in any irreversible or unavoidable significant environmental impacts." State of California, 1994 Environmental Impact Report, page 70.

20. Flushing flows which occur during the winter significantly reduce the long-term impact of suction dredging. Harvey, 1986.

21. Dredges working within the same area on the same stream did not compound the effects on the environment. Hassler, et al 1986.

22. There are no additive effects from multiple dredges operating on the same stream. Harvey, 1982.

23. "...the cumulative effects of suction dredging would appear to be less than significant and not deleterious to fish." State of California, 1994 Environmental Impact Report, page 71.

24. No person in California has ever been sickened from eating mercury contaminated sport fish. California Department of Health Website.

25. A suction dredge is 98% efficient at removing mercury from the watershed. Humphreys, 2010, California Water Board.

26. Mercury levels, as measured by the US Environmental Protection Agency have been decreasing in California Rivers during the period suction dredging has been ongoing. In the measured rivers the mercury levels have decreased by 3 to 7%. Chalmers, et al, 2010.

27. "At Site 1, dredge operations had no discernible effect on alkalinity, hardness or specific conductance on the Fortymile. Prussian, A.M. et al, 1997.

28. "During operation of the dredge turbidity values ranged from 1 NTU upstream from the dredge to 25 NTUs immediately below the dredge. The elevated turbidity declined rapidly downstream and by 160m turbidity values had returned to values upstream from the dredge." Prussian, A.M. et al, 1997.

29. Suction dredging is not the proximate, secondary or possibly even a related cause for the decline of amphibian species in California. The US Park Service found a 10,000% increase in threatened frog species populations when non-native trout were removed from their habitat. US Park Service, 2012.

30. Researches have determined a strong relationship between trout stocking programs and the decline of endangered and threatened frog species. The same studies show a marked increase in frog populations when non-native fish are removed. Knapp, et al. 1996.

31. "Results showed that metal concentrations discharged from small scale gold dredges are not a significant concern for aquatic life in the Similkameen River." US EPA, the report goes on to say "...water quality concerns were probably negligible for metals..." Johnson et al, 2005

32. In a US EPA sponsored study of suction dredges operating on the Fortymile River of Alaska, the research found that recovery of invertebrate species was rapid and reached pre-dredging populations within thirty days of dredging. Prussian, A.M. et al, 1997.

33. In both the 1994 and the 2011 Environmental Impact Reports, the California Department of Fish and Game reported a 96% compliance rate by suction dredgers with the 1994 Suction Dredging Regulations. State of California, 1994 Environmental Impact Report, 2011 Supplemental Environmental Impact Report.

34. Seventy organizations and businesses are supporting and funding the litigation by miners challenging the California legislation, EIR and regulations. (Western Mining Alliance, Suction Dredge Fact Sheet).

# REFERENCES

Chalmers, A.T. et al, 2010. Mercury Trends in Fish from Rivers and Lakes in the United States, United States Geological Survey.

Greene, J.C. and C. Wise, 2007. Turbidity and the Effects of Scale.

Griffith, J.S., and D.A. Andrews. 1981. Effects of a small suction dredge on fishes and invertebrates in Idaho streams. North American Journal of Fisheries Management 1:21-28.

Harvey, B.C. 1986. Effects of suction gold dredging on fish and invertebrates in two California streams. North American Journal of Fisheries Management 6:401-409.

Harvey, B.C. 1986. Effects of suction gold dredging on fish and invertebrates in two California streams. Dept. of Wildlife and Fisheries, UC Davis.

Harvey, B.C., K. McClenaghan, Jack D. Linn, and Cheryl L. Langley, 1982. Some Physical and Biological Effects of Suction Dredge Mining. California Department of Fish and Game, Environmental Services Branch, Laboratory Report No. 82-3, 20 pp.

Hassler, Thomas J. William L. Somer and Gary R. Stern. 1986. Impacts of Suction Dredge Mining on Anadromous Fish, Invertebrates and Habitat in Canyon Creek, California. California Cooperative Research Unit, U.S. Fish and Wildlife Service, Humboldt State University, Cooperative Agreement No. 14-16-0009-1547, Work Order No. 2, Final Report.

Johnson et al, 2005. Effects of Small Scale Gold Dredging on Arsenic, Copper, Lead, and Zinc Concentrations in the Similkameen River, State of Washington.

Knapp, R.A. et al, 1996. Non-native trout in natural lakes of the Sierra Nevada, an Analysis of their impacts on wildlife.

Knapp, R.A. et al, 2003. Developing probabilistic models to predict amphibian site occupancy in a patchy environment.

Lewis, R.H. 1962. Results of Gold Suction Dredge Investigation. Memorandum of September 17, 1962. California Department of Fish and Game, Sacramento, California, 7 pp.

McClenaghan, K., and R.E. Johnson. 1983. Suction Dredge Gold Mining in the Mother Lode Region of California. California Department of Fish and Game, Environmental Services Branch Administrative Report 83-1, Sacramento, California, 16 pp.

North, A. Phillip, 1993. A Review of the Regulations and Literature Regarding the Environmental Impacts of Suction Gold Dredges. U.S. Environmental Protection Agency, Region 10, Alaska Operations Office.

Prussian, A.M. et al, 1997. Suction Dredging Effects on Water Quality, US Environmental Protection Agency.

Prussian, A.M. et al, 1999. Impact of suction dredging on water quality, benthic habitat, and biota in the Fortymile River, Resurrection Creek and Chatanika River, Alaska. US Environmental Protection Agency.

R2 Consultants, 2006. Small Scale Mineral Prospecting White Paper. Washington Department of Fish and Wildlife, Olympia, WA 98501.

Somer, W.L., and T.J. Hassler, 1992. Effects of Suction Dredge Gold Mining on Benthic Invertebrates in a Northern California Stream. North American Journal of Fisheries Management 12:244-252.

State of California, California Water Board, 2005. Mercury Losses and Recovery During a Suction Dredge Test in the South Fork of the American River.

State of California, Department of Fish and Game, 2010. Draft Environmental Impact Report.

State of California, Department of Fish and Game, 1994. Final Environmental Impact Report, Suction Dredging.

State of California, the Resources Department, 2007. Mercury Contamination in Fish in Northern California Lakes and Reservoirs.

State of California, Department of Health, 2012. www.oehha.ca.gov/fishing, June 2012.

Stern, G.R. 1988. Effects of suction dredge mining on anadromous salmonid habitat in Canyon Creek, Trinity County, California. M.S. Thesis, Humboldt State University, Arcata, California, 80 pp.

Thomas, V.G. 1985. Experimentally determined impacts of a small suction dredge on a Montana stream. North American Journal of Fisheries Management 5:480-488.

U.S. Geological Survey, 2010. The Effects of Sediment and Mercury Mobilization in the South Yuba River Watershed.

U.S. Geological Survey, 2002. Anthropogenic Sources of Atmospheric Mercury.

U.S. Environmental Protection Agency, 1997. Mercury Report to Congress.

U.S. Environmental Protection Agency, 1995. Water Quality Criteria for the Protection of Wildlife.

US Environmental Protection Agency, 2006. Fact Sheet, NPDES Permit Number AK-005345-7.

U.S. National Park Service, 2011. Restoration of Native Species in High Elevation Aquatic Ecosystems.

Western Mining Alliance, 2012. Suction Dredge Fact Sheet. www.westernminingalliance.org.

Gmail - Re: the community requests Transparency. Who is backing the mineral withdraw...   Page 1 of 2



**RECEIVED**
Date 1·26· 13   By

Ida Reman< talktoida@gmail.com>



## Re: the community requests Transparency. Who is backing the mineral withdraw? Names, home address
1 message

**Kerby Jackson** < kerbyjackson@mail.com>                                           Wed, Jan 23, 2013 at 3:33 AM
To: eggs@myexcel.com, sen.alanbates@state.or.us
Cc: Jack Swift land use attorney <jhswft@earthlink.net>, Ron Gibson Jefferson Mining dist <dritecrg@hotmail.com>, Waldo Mining District
<wmdistrict@budget.net>, Dave Mack - New 49ers <dave@promackmining.com>

Why don't we ask a few, much more important questions on this matter:

Senator Bates, where do you get off thinking that YOU have authority to violate the Oregon Admission Act to usurp Congressional
authority pertaining to the disposal of land and the rules and regulations established by Congress pertaining to the terms of said
disposal?

Where is YOUR authority to legislate to violate the same admission act and to place non-navigable waterways (which this state has
no lawful claim to) under the jurisdiction of the Oregon Department of State Lands?

Where do you get off thinking that YOU have authority to create a de facto mineral withdrawal, when this authority resides
exclusively in Congress, as well as the President and the Secretary of the United States Department of Interior who were conveyed
with that authority in the Pickett Act?

Where is YOUR lawful authority to legislate to place certain sections of the Public Domain of the United States, as well as
appropriated locatable mineral deposits inside of that domain, under the jurisdiction of the Oregon Department of State Lands for the
purpose of prohibiting placer mining?

Where do you get YOUR authority to legislate to violate the 5th Amendment, as well as the Supremacy Clause and the  Contract
Clause of the United States Constitution?

Where is YOUR authority to legislate to violate Sections 18 and 21 of the Constitution of the State of Oregon?

I am, of course, reffering to the recent legislation which you introduced pertaining to placer mining in Oregon and also to State
Scenic Waterways.

Here's a reality check for you, Senator.

You don't have lawful authority to do any of the above, and your attempts to deprive miners (and others) of their rights and their
property, and to attempt to criminalize their Congressionally granted rights for your political agenda constitutes constructive trust
fraud, a deprivation of rights, attempted extortion of real estate and unlawful interference with federally protected rights and
activities.

I am aware, Senator, that not all men in the State of Oregon are actually created equally and that you have certain immunities as a
legislator. That being said, I am also aware that this immunity is also limited.

Be aware, Mr. Bates, it is my opinion that you are committing felonies under Federal Law, from which you are NOT immune from
prosecution, let alone are you immune from any torts arising from said felonious activities. Also be reminded, that when you act
outside of your lawful authority, that you are the one who will be responsible to foot your legal bill - not the people of this state.

Your activity is endangering the very existence of the State of Oregon, which is already in a financially precarious position.

That above being taken into consideration, how is your activity not sedition and not treason, as defined in current United States Title
Code? I suggest that you study those provisions of Federal law.

Mr. Bates, this is neither a joke, nor an idle threat. This is, in fact, a very serious matter.

Understand that **all lawful remedy and lawful options are considered to be ON THE TABLE in this matter**.

I hope you understand that we are so adamant about this position that miners across the entire country are calling for Congressional
intervention in your attempt to deprive them of their granted rights and mineral estate property which derived from Congressional
authority.

You will recall that I publicly suggested that you consult with an attorney if you did not understand the civil and criminal ramifications
of your current activity. Again, I would stress the importance of you doing just that.

Regards,

Kerby Jackson
Executive Officer - Galice Mining District
www.galicemining.com

cc: Recorder - Galice Mining District

*EXHIBIT "G"*

Case 6:13-cv-00682-TC   Document 1-1   Filed 04/23/13   Page 23 of 47

Gmail - Re: the community requests Transparency. Who is backing the mineral withdraw...   Page 2 of 2

----- Original Message -----
From: eggs@myexcel.com
Sent: 01/21/13 09:00 AM
To: sen.alanbates@state.or.us, gs@kswild.org
Subject: the community requests Transparency. Who is backing the mineral withdraw? Names, home address

Honorable Senator Alan,

Which environmental activists are pushing you forward on these State
sponsored mining bans?

My name is Mark Johnson.  I live in Grants Pass, Oregon.

Dave Mack lives in Happy Camp CA.

Kerby Jackson lives in Grants Pass.

Ron Gibson lives in Grants Pass.

Many of the Waldo District live in the Cave Junction area.

We have nothing to hide.  Disclose the truth please.

Do we have to file some sort of Freedom of Information request for this
information?

Regards,

mark johnson
grants Pass, OR
541-476-8507

Gmail - SB 115



Page 1 of 1



Ida Reman< talktoida@gmail.com>

## SB 115
1 message

**Kerby Jackson**< kerbyjackson@mail.com>
To: sen.petercourtney@state.or.us, Sen.JackieDingfelder@state.or.us
Cc: Ida Reman <talktoida@gmail.com>

Tue, Jan 22, 2013 at 2:41 PM

Dear Senators,

I am writing to you regarding SB 115, which is a Senate Bill introduced to the 2013 Legislature by unknown parties.

It has become apparent that there is an attempt to keep the identity of the sponsor of this devestating, not to mention UNLAWFUL bill, a secret from the afflicted parties, which in this case, are those Citizens of the United States who through their own self initiation, are grantees of locatable mineral deposit properties upon the Public Domain via an Act of Congress.

Under current Oregon Senate Rule 12.01, the sponsor must be listed on said bill. At this point, the source of said bill is completely anonymous, which opens up the entire State Senate to certain liabilities.

Mr. Courtney, as the President of the Oregon Senate, please see that the sponsor of SB 115 is either clearly identified or that the bill is stricken for non-compliance.

Ms. Dingfelder, as the Chair of the committee responsible for reviewing SB 115, please insure that your committee is not approving legislation that fails to conform to Senate Rules, let alone those that attempt to criminalize federally protected rights or that violate other Federal Laws.

Regards,

Kerby Jackson
Executive Officer - Galice Mining District
www.galicemining.com

cc: ida-lee, family of reman; Recorder - Galice Mining District

Gmail - Public Records Request regarding SB 115

Page 1 of 2



**RECEIVED**
Date 1·26·13 By

Ida Reman< talktoida@gmail.com>

## Public Records Request regarding SB 115
1 message

**Kerby Jackson**< kerbyjackson@mail.com>
To: Sen.JackieDingfelder@state.or.us
Cc: Ida Reman <talktoida@gmail.com>

Fri, Jan 25, 2013 at 1:59 AM

January 25th, 2013

RE: Public Records Request

Ms. **JACKIE DINGFELDER**:

Pursuant to the **Chapter 192 of the Oregon Revised States**, I request **digital copies of all records, notes, recommendations, legal examinations, minutes of meetings and internal and external correspondences** pertaining to <u>**Senate Bill 115**</u>, titled, <u>**Relating to placer mining; creating new provisions; amending ORS 196.910 and 390.835; and declaring an emergency**</u>. **I also request the identity of the author(s), contributors and sponsor(s) of Senate Bill 115** which have been kept in anonymity by the Senate of the State of Oregon.

I also request a waiver of all digitization and duplication fees. This request is non-commercial in nature and is for the public benefit, the findings thereof, to be published in appropriate venues such as will reach the affected public.

As the Chair of the Senate Committee of Environment and Natural Resources, your office is a custodian of said records.

Said digital records are requested to be delivered to: kerbyjackson@mail.com

If my request is denied in whole or in part, I ask that you justify all deletions by individual reference to the specific exemptions outlined in ORS 192.501 and ORS 192.502. I will also expect you to release all segregable portions of otherwise exempt material. I will remind you that ORS 192 insures public access of governmental records, and that the burden is upon the government – not upon the public – to substantiate lawful reasons for the non-disclosure of public records.

I, of course, reserve the right to appeal any decision to withhold any information or to deny a waiver of fees.

I look forward to your timely reply, as is required by State and Federal Law.

Thank you for your assistance.

Sincerely,

Kerby Jackson
Chief Executive Office – Galice Mining District

EXHIBIT " I "

e-mail: kerbyjackson@mail.com

cc: Recorder - Galice Mining District

Gmail - Public Records Request pertaining to SB 115



**RECEIVED**

Date
1·26·13    By

Page 1 of 2



Ida Reman< talktoida@gmail.com>

## Public Records Request pertaining to SB 115
1 message

**Kerby Jackson**< kerbyjackson@mail.com>
To: sen.petercourtney@state.or.us
Cc: Ida Reman <talktoida@gmail.com>

Fri, Jan 25, 2013 at 1:56 AM

January 25th, 2013

RE: Public Records Request

Mr. **PETER COURTNEY**:

Pursuant to the **Chapter 192 of the Oregon Revised States**, I request **digital copies of all records, notes, recommendations, legal examinations, minutes of meetings and internal and external correspondences** pertaining to **Senate Bill 115**, titled, **Relating to placer mining; creating new provisions; amending ORS 196.910 and 390.835; and declaring an emergency**. I also request the **identity of the author(s), contributors and sponsor(s) of Senate Bill 115** which have been kept in anonymity by the Senate of the State of Oregon.

I also request a waiver of all digitization and duplication fees. This request is non-commercial in nature and is for the public benefit, the findings thereof, to be published in appropriate venues such as will reach the affected public.

As the President of the Senate of Oregon, your office is a custodian of said records.

Said digital records are requested to be delivered to: kerbyjackson@mail.com

If my request is denied in whole or in part, I ask that you justify all deletions by individual reference to the specific exemptions outlined in ORS 192.501 and ORS 192.502. I will also expect you to release all segregable portions of otherwise exempt material. I will remind you that ORS 192 insures public access of governmental records, and that the burden is upon the government – not upon the public – to substantiate lawful reasons for the non-disclosure of public records.

I, of course, reserve the right to appeal any decision to withhold any information or to deny a waiver of fees.

I look forward to your timely reply, as is required by State and Federal Law.

Thank you for your assistance.

Sincerely,

Kerby Jackson
Chief Executive Office – Galice Mining District

e-mail: kerbyjackson@mail.com

cc: Recorder - Galice Mining District



## Galice Mining District
{ 1525 } Plat I  Sutherlin, oregon { 97479 }

January 25th, 2013

RE: Public Records Request

Mr. **PETER COURTNEY**:

　　Pursuant to the **Chapter 192 of the Oregon Revised States**, I request **digital copies of all records, notes, recommendations, legal examinations, minutes of meetings and internal and external correspondences** pertaining to <u>**Senate Bill 115**</u>, titled, <u>**Relating to placer mining; creating new provisions; amending ORS 196.910 and 390.835; and declaring an emergency**</u>. **I also request the identity of the author(s), contributors and sponsor(s) of Senate Bill 115** which have been kept in anonymity by the Senate of the State of Oregon.

　　I also request a waiver of all digitization and duplication fees. This request is non-commercial in nature and is for the public benefit, the findings thereof, to be published in appropriate venues such as will reach the affected public.

　　As the President of the Senate of Oregon, your office is a custodian of said records.

　　Said digital records are requested to be delivered to: kerbyjackson@mail.com

　　If my request is denied in whole or in part, I ask that you justify all deletions by individual reference to the specific exemptions outlined in ORS 192.501 and ORS 192.502. I will also expect you to release all segregable portions of otherwise exempt material. I will remind you that ORS 192 insures public access of governmental records, and that the burden is upon the government – not upon the public – to substantiate lawful reasons for the non-disclosure of public records.

　　I, of course, reserve the right to appeal any decision to withhold any information or to deny a waiver of fees.

　　I look forward to your timely reply, as is required by State and Federal Law. Thank you for your assistance.

Sincerely,

_____

Kerby Jackson
Chief Executive Office – Galice Mining District
e-mail: kerbyjackson@mail.com

:ida-lee: [reman]
_____

:ida-lee: family of reman

Recorder - Galice Mining District
talktoida@gmail.com





**Galice Mining District**

{ 1525 } Plat 1   Sutherlin, oregon { 97479 }

January 25th, 2013
RE: Public Records Request

Ms. **JACKIE DINGFELDER**:

Pursuant to the **Chapter 192 of the Oregon Revised States**, I request **digital copies of all records, notes, recommendations, legal examinations, minutes of meetings and internal and external correspondences** pertaining to **Senate Bill 115**, titled, **Relating to placer mining; creating new provisions; amending ORS 196.910 and 390.835; and declaring an emergency**. **I also request the identity of the author(s), contributors and sponsor(s) of Senate Bill 115** which have been kept in anonymity by the Senate of the State of Oregon.

I also request a waiver of all digitization and duplication fees. This request is non-commercial in nature and is for the public benefit, the findings thereof, to be published in appropriate venues such as will reach the affected public.

As the Chair of the Senate Committee of Environment and Natural Resources, your office is a custodian of said records.

Said digital records are requested to be delivered to: kerbyjackson@mail.com

If my request is denied in whole or in part, I ask that you justify all deletions by individual reference to the specific exemptions outlined in ORS 192.501 and ORS 192.502. I will also expect you to release all segregable portions of otherwise exempt material. I will remind you that ORS 192 insures public access of governmental records, and that the burden is upon the government – not upon the public – to substantiate lawful reasons for the non-disclosure of public records.

I, of course, reserve the right to appeal any decision to withhold any information or to deny a waiver of fees.

I look forward to your timely reply, as is required by State and Federal Law. Thank you for your assistance.

Sincerely,

Kerby Jackson
Chief Executive Office – Galice Mining District
e-mail: kerbyjackson@mail.com

:ida-lee: [reman]
:ida-lee: family of [reman]

Recorder - Galice Mining District
e-mail: talktoida@gmail.com





**Galice Mining District**

{ 1525 } Plat 1   Sutherlin, oregon { 97479 }

Dear Senators,

January 31, 2013

I am writing to you regarding SB 115, which is a Senate Bill introduced to the 2013 Legislature by unknown parties.

It has become apparent that there is an attempt to keep the identity of the sponsor of this devastating, not to mention UNLAWFUL bill, a secret from the afflicted parties, which in this case, are those Citizens of the United States who through their own self initiation, are grantees of locatable mineral deposit properties upon the Public Domain via an Act of Congress.

Under current Oregon Senate Rule 12.01, the sponsor must be listed on said bill. At this point, the source of said bill is completely anonymous, which opens up the entire State Senate to certain liabilities.

Mr. Courtney, as the President of the Oregon Senate, please see that the sponsor of SB 115 is either clearly identified or that the bill is stricken for non-compliance.

Ms. Dingfelder, as the Chair of the committee responsible for reviewing SB 115, please insure that your committee is not approving legislation that fails to conform to Senate Rules, let alone those that attempt to criminalize federally protected rights or that violate other Federal Laws.

Regards,

Kerby Jackson
Executive Officer - Galice Mining District
www.galicemining.com

: ida-lee: family of reman

Recorder - Galice Mining District

DEXTER A. JOHNSON
LEGISLATIVE COUNSEL



900 COURT ST NE  S101
SALEM, OREGON 97301-4065
(503) 986-1243
FAX: (503) 373-1043



## STATE OF OREGON
### Legislative Counsel Committee



February 4, 2013

Kerby Jackson
Chief Executive Office
Galice Mining District
kerbyjackson@mail.com

Delivered via email

Dear Mr. Jackson:

This letter responds to your email of January 25, 2013, making a public records request of Senate President Peter Courtney for the following material:

**digital copies of all records, notes, recommendations, legal examinations, minutes of meetings and internal and external correspondences** pertaining to **Senate Bill 115**, titled, **Relating to placer mining; creating new provisions; amending ORS 196.910 and 390.835; and declaring an emergency. I also request the identity of the author(s), contributors and sponsor(s) of Senate Bill 115** [.]

The Office of the Senate President is not in possession of any records described in your request that are not already available on the Internet or otherwise in the public domain.  Please consult the legislative website http://www.leg.state.or.us/ for the text of the measure, staff reports related to the measure, recordings of hearings and floor sessions, and other related material.  Note also that SB 115 has not yet had any legislative hearings; many of the records that you are seeking are not created until a bill has a hearing, and correspond with the legislative history of the bill.

The Legislative Assembly and the members of the Legislative Assembly are exempt from the Public Records Law when the Legislative Assembly is in session and the 15 days preceding the start of a legislative session.  ORS 192.410 (5).  Nothing in this response serves as a waiver of the right of the Senate President or any other member of the Legislative Assembly to claim this exemption for any other public records request made during a period in which the Legislative Assembly is in session.

I hope this information is helpful.

Very truly yours,

Dexter A. Johnson
Legislative Counsel

EXHIBIT 5



| Public Records Request: | #260 |
|---|---|
| Received: | Jan 25 2013 |
| Requestor: | Kerby Jackson |

**From:** Kerby Jackson [mailto:kerbyjackson@mail.com]
**Sent:** Friday, January 25, 2013 2:00 AM
**To:** Sen Dingfelder
**Cc:** Ida Reman
**Subject:** Public Records Request regarding SB 115

January 25th, 2013

RE: Public Records Request

### Ms. **JACKIE DINGFELDER**:

Pursuant to the **Chapter 192 of the Oregon Revised States,** I request **digital copies of all records, notes, recommendations, legal examinations, minutes of meetings and internal and external correspondences** pertaining to **Senate Bill 115,** titled, **Relating to placer mining: creating new provisions: amending ORS 196.910 and 390.835: and declaring an emergency.** **I also request the identity of the author(s), contributors and sponsor(s) of Senate Bill 115** which have been kept in anonymity by the Senate of the State of Oregon.

I also request a waiver of all digitization and duplication fees. This request is non-commercial in nature and is for the public benefit, the findings thereof, to be published in appropriate venues such as will reach the affected public.

As the Chair of the Senate Committee of Environment and Natural Resources, your office is a custodian of said records.

Said digital records are requested to be delivered to: kerbyjackson@mail.com

If my request is denied in whole or in part, I ask that you justify all deletions by individual reference to the specific exemptions outlined in ORS 192.501 and ORS 192.502. I will also expect you to release all segregable portions of otherwise exempt material. I will remind you that ORS 192 insures public access of governmental records, and that the burden is upon the government – not upon the public – to substantiate lawful reasons for the non-disclosure of public records.

I, of course, reserve the right to appeal any decision to withhold any information or to deny a waiver of fees.

I look forward to your timely reply, as is required by State and Federal Law.

Thank you for your assistance.

Sincerely,

EXHIBIT K

Kerby Jackson

Chief Executive Office – Galice Mining District

e-mail: kerbyjackson@mail.com

cc: Recorder - Galice Mining District

 **LEGISLATIVE ADMINISTRATION**

Office of the Administrator

January 29, 2013

Kerby Jackson
Chief Executive Office
Galice Mining District
kerbyjackson@mail.com

Re: Public Records Request #260

Dear Kerby Jackson:

In accordance with ORS 192.440(2), this acknowledges our receipt of your public records request made of Senator Jackie Dingfelder on January 25, 2013, a copy of which is enclosed. Your request tracking number is #260. Please reference this number in future correspondence.

Legislative Administration Committee (LAC) employees will search for the record(s) and make an appropriate response as soon as practicable and without unreasonable delay. LAC will provide a time and cost estimate to you within a reasonable amount of time and prior to processing the request. Fees may be waived or reduced by the Legislative Administrator.

Finally, the Legislative Assembly and its members and employees are not subject to the public records law during a legislative session, insofar as they are exempt under section 9, Article IV of the Oregon Constitution and ORS 192.410 (5). Nothing in this letter constitutes a waiver of that exemption.

Sincerely,

Kevin M. Hayden
Legislative Administrator



Ida Reman< talktoida@gmail.com>

## Fw: Public Records Request (PRR) 260
3 messages

**Kerby Jackson**< kerbyjackson@mail.com>                                Sat, Apr 20, 2013 at 10:27 PM
To: Ida Reman <talktoida@gmail.com>

----- Original Message -----
From: Brandes Emily
Sent: 01/30/13 07:48 AM
To: kerbyjackson@mail.com
Subject: Public Records Request (PRR) 260

Good morning,

Attached please find the formal acknowledgement letter from Legislative Administrator Kevin Hayden,
regarding the above mentioned Public Records Request (PRR 260). Please don't hesitate to contact
me with any questions or concerns.

Thank you,

Emily Brandes

Legislative Administration

Oregon State Legislature

503.986.1848

**2 attachments**

 **20130129_PRR_260_Original Request.pdf**
20K

 **20130129_PRR_260_Acknowledgment.pdf**
54K

**Kerby Jackson**< kerbyjackson@mail.com>                    Sat, Apr 20, 2013 at 10:28 PM
To: Ida Reman <talktoida@gmail.com>

----- Original Message -----
From: Brandes Emily
Sent: 02/15/13 04:38 PM
To: kerbyjackson@mail.com
Subject: Public Records Request (PRR) 260

Good afternoon,

Attached please find the cost estimate for public records request 260. Please confirm that you would
like to proceed with this request.

Please don't hesitate to contact me with any questions or concerns.

Thank you,

Emily Brandes

Legislative Administration

Oregon State Legislature

503.986.1848

**From:** Kerby Jackson [mailto:kerbyjackson@mail.com]
**Sent:** Wednesday, January 30, 2013 9:01 AM
**To:** Brandes Emily
**Subject:** Re: Public Records Request (PRR) 260

Thank you for much the prompt response.

Regards,

Kerby Jackson
Galice Mining District
www.galicemining.com

[Quoted text hidden]

 **20130215_PRR_260_Cost Estimate.pdf**
36K

**Kerby Jackson**< kerbyjackson@mail.com>                          Sat, Apr 20, 2013 at 10:31 PM
To: Ida Reman <talktoida@gmail.com>

----- Original Message -----
From: Kerby Jackson
Sent: 02/22/13 04:21 AM
To: Brandes Emily
Subject: Re: Public Records Request (PRR) 260

Emily,

These fees are acceptable.

Please begin the process for fulfilling the request PRR#260 and confirm the details for
sending payment.
[Quoted text hidden]



## LEGISLATIVE
## ADMINISTRATION

February 14, 2013

Kerby Jackson
Chief Executive Office
Galice Mining District
kerbyjackson@mail.com

Re: Public Records Request #260

Dear Kerby Jackson

The cost estimate to prepare information for public records request 260 is $56.91. Please acknowledge
that you wish to proceed with this request.

Thank you.

Kevin M. Hayden
Legislative Administrator

# *Galice Mining District* COPY

{ 1525 } Plat 1   Sutherlin, oregon { 97479 }

To: Peter Courtney et. *al.*
900 Court St. NE S-201
Salem, Oregon 97301
CMN: 7010 1870 0003 5861 9996

To: Jackie Dingfelder *et. al*.
900 Court St. NE S-407
Salem, Oregon 97301
CMN: 7010 1870 0003 5861 9989

To: Alan Bates *et. al.*
900 Court St. NE S-407
Salem, Oregon 97301
CMN: 7010 1870 0003 5861 9170

March 4, 2013

Reg: **Notice of Pending Congressional Violations, Usurpation of Mining District Authority, Treason and Insurrection Against the Lives and Livelihoods of Miners**,

Dear Senators,

Due to your recent activities and your reluctance to be open about said activities it has become paramount and pertinent to the very existence of our miners to address the unlawfulness of your actions.

The simple truth of the matter is that Congressional mandate had never granted the state the right to create mining law. (See Mining Grant 1872) On the other hand Congress did authorize the formation and organization of mining districts at the discretion of the miners and vested them with the authority to create mining law. As recognition of said vesture, the various mining laws already being held and observed by the mining districts at the time were adopted and recognized as such. Your aggressive activities to forward SB 401 and SB 388 etc. are in direct violation of Congress' recognition of mining district powers and authority with regard to creating mining law.

**EXHIBIT " 7 "**

**Notice to Principal is Notice to Agent and Notice to Agent is Notice to Principal**

Considering the fiendish nature of SB 401 and SB 388 etc. there is little room for doubt that the lives and livelihoods of the miners guarded by the Galice Mining District and those outside the district will be severely impacted by said bills. It would be no exaggeration to anticipate the demise of the mining industry in southern oregon should SB 401 and SB 388 etc. become color of law.

Inasmuch as said laws would be violating the miners' constitutionally guarded rights to life, liberty and the pursuit of happiness, said state laws and rules would be regarded as unconstitutional and would be deemed null and void per the Galice Mining District Court. Inasmuch as said laws would be in blatant disregard of the Congressional mandates related to mining, said laws would be considered a usurpation of Mining District authority and an insurrection against the lives and livelihoods of its members. Inasmuch as miners were the first lawmakers in our territory, and inasmuch as the mining districts were the first governments in our territory, it follows that they have precedence; and whereas said precedence was acknowledged by Congress in the 1866 and the 1872 mining acts, the OREGON STATE SENATE/legislature are flagrantly ignoring their lack of standing and authority to override said precedence. Should the OREGON STATE SENATE proceed with these unlawful activities it could easily be construed as **treason** against the people of the united states and against the members of the mining district.

Having covered that aspect of your unwelcome and unwanted activities, we wish to address another issue which has a bearing on the matter, that of your status as Foreign Agents.

1. December 9th 1945 International Organization Immunities Act relinquished every public office of the United States to the United Nations. **(United Nations DUN Number (UN)-824777304)**

2. 22 CFR 92.12-92.31 FR Heading "Foreign Relationship" states that an oath is required to take office.

3. Title 8 USC 1481 stated once an oath of office is taken citizenship is relinquished, thus one becomes a foreign entity, agency, or state. That means every public office is a foreign state, including all political subdivisions. (i.e. STATE OF OREGON et al. and yourself for that matter.)

4. Title 22 USC (Foreign Relations and Intercourse) Chapter 11 identifies all
public officials as foreign agents.

As is clear in law, you as senators are in fact Foreign Agents. Having failed to abide by
your oaths of office to uphold the Constitution and the rights it guards you are now Foreign
Agents in violation of your oaths of office and conspiring to commit insurrection against the
miners of the united states and of the Galice Mining District. This activity may be construed as
evidence of your allegiance to the UN and your willingness to plunder the people of the united
states for the forwarding of your own policies and agendas to the detriment of our people and our
economy. Inasmuch as you intend to enforce your laws by threat of extortionate fines and
kidnapping, you clearly intend to inflict damage and harm to the people who wish to keep their
rights and have not consented to having their rights abrogated.( See the *Hobbs Act 18 U.S.C. §
1951*) Should you argue that you are merely regulating and not outlawing mining, we wish to
remind you that mining is a right which cannot be regulated or controlled (except as called for by
mining laws created by the miners); you have no authority to impose fines and threats of
imprisonment for the mere practice of a right. *"Where rights secured by the Constitution are
involved, there can be no rule making or legislation which would abrogate them." ( **Miranda vs.
Arizona**, 384 US 436, 491) and that ..."The claim and exercise of a constitutional Right cannot
be converted into a crime." (**Miller vs. U.S.**, 230 F. 486, 489) and that..."There can be no
sanction or penalty imposed upon one because of this exercise of constitutional Rights."* Your
actions are a direct attack against the rights, welfare, peace and dignity of the people of the
united states and of the Galice Mining District; in other words your activities are treasonous.
Bear in mind, pursuing your present trajectory will without a doubt make you **fully liable** under
*18 USC 242 (Deprivation of Rights), 18 USC 241 (Conspiracy to Deprive of Rights) and 18 USC
245 (Federally Protected Activities) 18 USC 81 (Piracy and Privateering) and 18 USC § 1659 –
(Attack to plunder vessel).*

The authors of this letter wish to address another point; that of your status as a private for
profit company. Inasmuch as THE STATE OF OREGON has a DUN and BRADSTREET
number - **State of Oregon-932534998** – it is understood that it is a private for profit
company/corporation. Inasmuch as it is private and for profit it follows that said profit would be
at the top of its priorities and not the rights or welfare of the people. That said, it makes

profitable sense that the employees of said private corporation would want to pass regulation giving themselves permission to arrest and fine ordinary people for simply trying to make a living. It is purely a matter of increasing revenue for themselves; what better way to do it than to fine people for making a living. The authors of this letter wish to challenge and demand the senators promoting SB 401 and SB 388 etc. to show proof in law and document at what point they - a private for profit company - were vested with the authority to fleece and arrest private nationals????

Should you insist on your imaginary status as a governmental body, we wish to place you on notice that you are in violation of the *OREGON ADMISSION ACTS ACT OF CONGRESS ADMITTING OREGON INTO UNION (Approved February 14, 1859)*. You have no right and no jurisdiction to assume control of land or water or minerals already granted by Congress. Having no right to assume control, you have no right to regulate what you do not control.

Your unlawful, felonious and treasonous activities have already posed an unwelcome expense to the officers and members of the Galice Mining District. This expense the authors of this letter have no intention of writing off; we but wait to see how much said expense will amount to before sending you the TRUE BILL. Should you posses the indiscretion and lack of foresight and actually pass these odious bills we will have no option but to prosecute you to the full extent of the law for damages sustained to our lives, our liberty and our properties. Our respective financial states have not been improved by your intrusions and should you proceed said damages will only be exacerbated and we have no qualms claiming restitution. We will prosecute you in every court with the jurisdiction to handle your multi-faceted crimes; be they administrative, commercial or common law, state, federal or mineral. Inasmuch as your crimes are clearly documentable in law, you will be held responsible for the sum total of ALL legal fees as well as the sum total of ALL damages caused miners and private property owners. YOU HAVE HEREBY BEEN PUT ON NOTICE.

Should any of you wish to rebut this NOTICE, rebuttals must be signed under penalty of perjury. Any communications by mail must be mailed to:

Galice Mining District, [1525] Platt I, Sutherlin, oregon. [97479]. Any alterations or absence of bracketing or alteration in the lack of capitalization and the punctuation of the addressees will cause your mail to be returned and will be regarded as failure to communicate.

All rights reserved; none waived.

Sincerely,

: kerby - dale: [jackson]
Chief Executive Office – Galice Mining District
e-mail: kerbyjackson@mail.com

:delant - cory: [palmerton]
Vice Executive Officer- Galice Mining District
Private Attorney General

:ida - lee: [reman]
Recorder - Galice Mining District
e-mail: talktoida@gmail.com

:irvin - lee: [adkins]
Private Attorney General

